[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 28, 2004
THOMAS K. KAHN
CLERK

_____

No. 01-13864

_____

D.C. Docket No. 00-01855-CV-AR-J

MICHAEL HOLLOMAN,
on behalf of and as Next Friend of his son,
Michael Holloman

Plaintiff-Appellant,

versus

GEORGE HARLAND, FAWN ALLRED,

Defendants-Appellees,

_____

No. 01-15094

_____

D.C. Docket No. 00-01855-CV-AR-J

MICHAEL HOLLOMAN, Jr.,

Plaintiff-Appellant,

versus

WALKER COUNTY BOARD OF EDUCATION,

Defendant-Appellee.

_____

Appeals from the United States District Court
for the Northern District of Alabama

_____

**(May 28, 2004)**

Before TJOFLAT, WILSON and COWEN[*], Circuit Judges.

TJOFLAT, Circuit Judge:


I.

Michael Holloman, a former student at Parrish High School in Walker County, Alabama, filed a § 1983 suit against Fawn Allred, his economics and government teacher; George Harland, the school principal; and the Walker County Board of Education ("School Board"), which oversaw the school. He claimed that his rights under the First Amendment's Speech Clause were violated when Allred and Harland punished him for silently raising his fist during the daily flag salute instead of reciting the Pledge of Allegiance with the rest of his class. He further claims that his Establishment Clause rights were violated by Allred's daily "ritual"

---

[*] Honorable Robert E. Cowen, United States Circuit Judge for the Third Circuit, sitting by designation.

of conducting a silent moment of prayer. He sought both legal and equitable relief.

The district court granted summary judgment on both claims to Allred and Harland on qualified immunity grounds. In a separate opinion, it granted summary judgment to the School Board, concluding that Holloman failed to articulate a violation of his constitutional rights or demonstrate a way in which the Board (as a municipal governing entity) could be held liable for the acts at issue here. Holloman appeals both rulings.

Subpart A of this Part examines the facts supporting Holloman's Speech Clause claim. Subpart B explains his Establishment Clause allegations. Subpart C sets forth the framework of state statutes and School Board regulations implicated by Holloman's claims, and Subpart D delves into the procedural history of this case in greater detail. Throughout this discussion, because we are reviewing grants of summary judgment to the defendants, we view the evidence in the light most favorable to the plaintiff. See Johnson v. Governor of Florida, No. 02-14469, 2003 U.S. App. LEXIS 25859, at *3 (11th Cir. Dec. 19, 2003).

A.

Holloman contends that Allred and Harland violated his First Amendment right to free speech (as incorporated against the states through the Fourteenth Amendment's Due Process Clause) by treating him adversely because he silently raised his fist during the flag salute instead of reciting the Pledge of Allegiance.[1] To understand what happened, it is necessary to consider their treatment of another student, John Michael Hutto, the day before their confrontation with Holloman.

1.

Allred taught her Economics and Government class in the first period of each day, during which time the Pledge of Allegiance was recited over the school intercom system. It was customary for students to stand by their desks, with their hands over their hearts, and recite the pledge.

During the flag salute on May 16, 2000, Hutto remained silent with his hands in his pockets, without causing a disturbance. When Allred asked him why he was not participating in the flag salute, Hutto responded that he "didn't want to say it, he didn't have to say it, and he hadn't said it for a month." Allred stated,

---

[1] We use the terms "Pledge of Allegiance" and "flag salute" interchangeably.

"You don't want to say the pledge and the United States Air Force Academy has given you a scholarship?," then continued class.

At lunch that day, Allred told Harland of Hutto's refusal to say the pledge. Harland became very angry and met with Allred, Hutto, and Vice Principal Jason Adkins in his office. Harland told Hutto that he was disappointed in Hutto's refusal to salute the flag, and threatened to report the incident to both Hutto's recruiter at the Air Force Academy as well as the Congressman who had recommended Hutto to the Academy. Harland also ordered Hutto to apologize to Allred and her class for refusing to salute the flag.

Later that day, Harland went to Hutto's physics class (in which Holloman was a student) and declared that "anyone who joined in [Hutto's] protest and refused to say the pledge or committed similar action would be punished." The following day, Hutto recited the Pledge of Allegiance with the rest of the class, and the day after that he apologized to Allred and her students.

2.

During the flag salute on the day after the Hutto incident, Holloman stood with the other students in Allred's class, but did not recite the Pledge of Allegiance. Instead, he silently raised his fist in the air while the rest of the class

5

recited the pledge; once the pledge was over, he sat down like everyone else. He did not say anything, touch any other students, disrupt the class, or obstruct anyone's view of the flag. Allred, however, immediately chastised him in front of the class, saying that he had acted inappropriately and "disrespectful[ly]," and that she was "disappointed." She then started class in her normal fashion.

Later that day, Allred informed Harland of what happened, and Harland summoned Allred and Holloman into the principal's office. Holloman explained that he had raised his fist "in protest of what happened to [Hutto]." Harland told Holloman "how disappointed he was, and that he felt that he had failed teaching Michael Holloman responsibility, morals and values." He also informed Holloman that he would have to serve three days' detention and could not receive his diploma until after he completed his punishment. In addition, Harland required Holloman to apologize to Allred's class. When Holloman left Harland's office, Harland called Holloman's mother, explaining "that he was too mad and upset to punish Michael at the time because he may hurt Michael."

Since graduation was that Friday, there was not enough time left in the school year for Holloman to serve his detentions while still being able to receive his diploma on graduation day. Harland consequently offered Holloman the

6

opportunity to receive a paddling instead. Holloman agreed and, with Allred watching, was paddled by Harland.

B.

Allred began her Economics and Government class almost every day by asking, "Does anyone have any prayer requests?" After her students offered various dedications, Allred would hold a moment of silence. Allred frequently opened this moment of silence by saying "Let us pray," and often ended it by saying "Amen." Allred explicitly states that over the 1999-2000 school year, this practice became a daily "ritual." She never told her students that they were free to leave the room during either her prayer requests or the subsequent moment of silent prayer.

One day, Vice Principle Adkins sat in on her class and personally observed this phenomenon. When Allred attempted to begin her economics lesson, one of her students raised her hand and reminded Allred that she had forgotten to elicit her customary prayer requests. At that point, Allred took prayer requests from the class, then commenced a moment of silence by saying, "Let us pray." On another occasion, at the conclusion of the moment of silence, Allred permitted one of her students to read aloud a passage from the Bible.

## C.

The events in this case did not occur in a vacuum. In 1995, the Alabama state legislature enacted a statute which required the State Board of Education and all local school boards to

> develop and implement . . . a comprehensive character education program for all grades to consist of not less than ten minutes of instruction per day focusing upon the students' development of the following character traits: courage, patriotism, citizenship, honesty, fairness, respect for others, kindness, cooperation, self-respect, self-control, courtesy, compassion, tolerance, diligence, generosity, punctuality, cleanliness, cheerfulness, school pride, respect for the environment, patience, creativity, sportsmanship, loyalty, and perseverance. Each plan of instruction shall include the Pledge of Allegiance to the American flag.

Ala. Code § 16-6B-2(h). This law made daily recitation of the Pledge of Allegiance a part of the character education program the Legislature required local school boards to implement. A separate statute, however, emphasized that students should not be forced to recite the pledge. See Ala. Code § 16-43-5 ("The State Board of Education shall afford all students attending public kindergarten, primary and secondary schools the opportunity each school day to voluntarily recite the pledge of allegiance to the United States flag." (emphasis added)).

To implement these requirements, Larry Banks, the Superintendent of the Walker County School District, sent a letter on behalf of the Walker County Board

8

of Education to all the principals in the district, stating, "[E]ach school system must incorporate a Character Education Plan which will consist of 10 minutes of instruction per day in various areas, such as, the Pledge of Allegiance . . . . Each day must include the Pledge of Allegiance and then other areas as mentioned as you determine at your school."

Banks also sent each principal a form to complete to specify how each school intended to incorporate into its curriculum the character-education requirements set forth above. The memo directed, "Please begin to make plans and be prepared to submit your local Character Education Plan [to the county school board] which must be forwarded to the State Superintendent's Office." The County School Board apparently had to either review or approve each school's character education plan before it was forwarded to the State. Allred contends that her daily moment of silent prayer was conducted in partial fulfillment of these character education requirements—it was intended to teach compassion.

D.

On July 3, 2000, Holloman and Hutto filed a class action suit under 42 U.S.C. § 1983 in the Northern District of Alabama against the Walker County Board of Education, Harland, Adkins, and Allred. They alleged that their First

Amendment rights had been violated because they had been chastised, threatened, and punished for refusing to say the Pledge of Allegiance. They also claimed that Allred's practice of soliciting prayer requests and setting aside a moment of silence for prayer violated the Establishment Clause. The complaint sought compensatory and punitive damages, as well as declaratory and injunctive relief.

A few months later, an amended complaint was filed; it was substantially identical to the original except Hutto was no longer a party. The district court dismissed Jason Adkins as a defendant (with Holloman's consent), and declined to certify the class action. Holloman does not appeal either of these rulings.

In their answer to Holloman's amended complaint, Allred and Harland cited qualified immunity as an affirmative defense. They later moved the court for summary judgment on qualified immunity grounds. The court granted their motion and dismissed them from the case. It concluded that Holloman's Speech Clause allegations did not constitute a First Amendment violation, and certainly not a violation of a right that was "clearly established" at the time of the incidents. The court also rejected Holloman's Establishment Clause claims, stating there was no Eleventh Circuit precedent during the 1999-2000 school year that "clearly established" a moment of silence for prayer as being unconstitutional. Holloman

appealed the court's decision to grant Allred and Harland summary judgment on qualified immunity grounds.[2]

Following the district court's dismissal of Holloman's claims against Allred and Harland, the Board of Education also sought summary judgment. The court granted the Board's motion, concluding that Holloman had not alleged facts sufficient to hold the Board liable under § 1983. Holloman appeals this ruling as well, arguing that he stated valid claims against the School Board.[3]

In these consolidated appeals, we review the district court orders granting the defendants summary judgment. Part II of this opinion explains why the district court erred in granting Allred and Harland summary judgment on qualified immunity grounds against Holloman's Speech Clause claims. Part III shows that Allred is not even potentially entitled to summary judgment on qualified immunity grounds against Holloman's Establishment Clause claims because she has not established as a matter of law that, in holding her daily moment of silent prayer, she was engaged in a discretionary function of her job. Part IV assesses Holloman's underlying Establishment Clause claim, concluding that he has

---

[2] The court's opinion dismissed all of Holloman's constitutional claims against both defendants with prejudice. It entered a final judgment in favor of Allred and Harland pursuant to Fed. R. Civ. P. 54(b), rendering its order immediately appealable. The appeal was docketed in this court as No. 01-13864.

[3] This appeal was docketed as No. 01-15094.

11

introduced evidence sufficient to support a determination that a clearly established right has been violated.[4]  Part V discusses how Holloman has successfully articulated several theories under which the School Board may be held liable for the Speech and Establishment Clause violations, while Part VI briefly concludes.

II.

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law [or] suit in equity . . . .

42 U.S.C. § 1983.  There are two ways in which an individual may be held liable under § 1983—he may be sued for his own personal actions ("direct liability"), or, under certain limited circumstances, for the actions of his subordinates ("supervisoral liability"), see, e.g., Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988).[5]

---

[4] We include this discussion because a legal determination that his constitutional rights were violated is a necessary predicate to allowing his suit against the School Board to proceed.

[5] A supervisor, of course, may be held responsible under either or both theories. See Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990) ("Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation [direct liability] or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation [supervisoral liability].").

When a government official is sued under a theory of direct liability, he may seek summary judgment on qualified immunity grounds.[6] To even be potentially eligible for summary judgment due to qualified immunity, the official must have been engaged in a "discretionary function" when he performed the acts of which the plaintiff complains. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982) (holding that qualified immunity extends to "government officials performing discretionary functions"). It is the burden of the governmental official to make this showing. Storck v. City of Coral Springs, No. 02-16956, 2003 U.S. App. LEXIS 26415, at *16 (Dec. 30, 2003) ("Under qualified immunity analysis, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly unconstitutional acts took place." (emphasis added)). A defendant unable to meet this burden may not receive summary judgment on qualified immunity grounds. Lumley v. City of Dade City, 327 F.3d 1186, 1194 (11th Cir. 2003) ("If the defendants were not acting within their discretionary authority, they are ineligible for the benefit of qualified immunity."); see also Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002). While a number of our cases omit this step of the analysis, see, e.g., Denno

_____

[6] The government official may also seek to have the complaint dismissed on qualified immunity grounds prior to discovery, based solely on the allegations in the pleadings.

13

v. Sch. Bd., 218 F.3d 1267 (11th Cir. 2000); Hall v. Talladega City Bd. of Educ., 115 F.3d 821 (11th Cir. 1997), binding Supreme Court and Eleventh Circuit precedents require us to consider expressly this critical threshold matter. We explain this "discretionary function" test in greater detail in Subpart II.A.

If, interpreting the evidence in the light most favorable to the plaintiff, the court concludes that the defendant was engaged in a discretionary function, then the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity. Cottone v. Jenne, 326 F.3d 1352, 1358 (11th Cir. 2003) ("Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity."). To overcome qualified immunity, the plaintiff must satisfy a two prong test; he must show that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation.[7] Wilson v. Layne, 526 U.S. 603, 609, 119 S. Ct. 1692, 1697, 143 L. Ed. 2d 818 (1999) ("A court evaluating a claim of qualified immunity must

_____

[7] Our rulings on these two questions are legal conclusions that are binding law of the case and may not be revisited in later proceedings. Consequently, once we deny defendants summary judgment on qualified immunity grounds because the plaintiff has alleged violations of clearly established rights, the defendants may not later attempt to re-assert qualified immunity against those claims on purely legal bases (e.g. by arguing that the rights do not exist or are not clearly established). The only remaining issues are questions of fact—i.e., whether the plaintiff can actually prove at trial that the alleged violations occurred.

first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.") (quotations and citations omitted).  If the plaintiff prevails on both prongs of this test, then the defendant is unable to obtain summary judgment on qualified immunity grounds.

Applying this test, the district court awarded Allred and Harland summary judgment against Holloman's Speech Clause claims.  The Speech Clause of the First Amendment protects at least two separate, yet related, rights: (1) the right to freedom of expression, and (2) the right to be free from compelled expression. United States v. United Foods, Inc., 533 U.S. 405, 410, 121 S. Ct. 2334, 2338, 150 L. Ed. 2d 438 (2001).  These rights unquestionably exist in public schools.  See Tinker v. Des Moines Indep. Comm. Sch. Dist., 393 U.S. 503, 506, 89 S. Ct. 733, 736, 21 L. Ed. 2d 731 (1969).

Holloman argues that Allred and Harland are directly liable for violating both constitutional rights guaranteed by the Speech Clause.  First, he maintains, they violated his right to be free from compelled expression by chastising, threatening, and ultimately punishing him for failing to recite the Pledge of Allegiance.  Second, to the extent that he was punished for silently raising his fist in the air during the Pledge of Allegiance (rather than for simply failing to recite

15

the pledge), Holloman contends that Allred and Harland violated his right to engage in affirmative expression. Finally, regardless of whether Holloman's expression was constitutionally protected in itself, he has the First Amendment right to be free of viewpoint-based discrimination and punishment.

We conclude that Allred nor Harland are not entitled to summary judgment on qualified immunity grounds against any of these First Amendment claims. In Subpart II.A, we conclude that both Allred and Harland were engaged in a discretionary function at the time they disciplined Holloman in connection with the flag salute incident, and so are potentially entitled to summary judgment on qualified immunity grounds. In Subpart II.B, we discuss how the evidence—interpreted in the light most favorable to Holloman—supports the conclusion that his clearly-established right to be free from compelled speech was violated. Subpart II.C makes a similar finding regarding his right to engage in affirmative expression. Subpart II.D concludes that, even if—as the dissent contends—Holloman's expression was not itself constitutionally protected, a Allred's behavior nevertheless violated the First Amendment because she punished him for expressing a viewpoint she found repugnant, rather than for any disruption he purportedly caused (which, interpreting the evidence in his favor, was entirely negligible). Consequently, Holloman has made the necessary

16

showings with regard to his three Speech Clause claims to overcome Allred's and

Harland's assertions of qualified immunity at this stage.

A.

In many areas other than qualified immunity, a "discretionary function" is

defined as an activity requiring the exercise of independent judgment, and is the

opposite of a "ministerial task." See, e.g., Williams v. Wood, 612 F.2d 982, 985

(5th Cir. 1980).[8]  In the qualified immunity context, however, we appear to have

abandoned this "discretionary function / ministerial task" dichotomy.  In McCoy v.

Webster, 47 F.3d 404, 407 (11th Cir. 1995), we interpreted "the term

'discretionary authority' to include actions that do not necessarily involve an

element of choice," and emphasized that, for purposes of qualified immunity, a

governmental actor engaged in purely ministerial activities can nevertheless be

performing a discretionary function.

Instead of focusing on whether the acts in question involved the exercise of

actual discretion, we assess whether they are of a type that fell within the

employee's job responsibilities.  Our inquiry is two-fold.  We ask whether the

---

[8] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

17

government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize. See Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1185 n.17 (11th Cir. 1994) ("A government official acts within his or her discretionary authority if objective circumstances compel the conclusion that challenged actions occurred in the performance of the official's duties and within the scope of this authority." (emphasis added)).

One might reasonably believe that violating someone's constitutional rights is never a legitimate job-related function or within the scope of a government official's authority or power. As we explained in Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1282 (11th Cir. 1998) (quotation marks and citation omitted), however, "the inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act. Framed that way, the inquiry is no more than an untenable tautology." In applying each prong of this test, we look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances.

Consider the first prong of the test—whether the official is engaged in a legitimate job-related function. In Sims v. Metropolitan Dade County, 972 F.2d

1230 (11th Cir. 1992), "we did not ask whether it was within the defendant's authority to suspend an employee for an improper reason; instead, we asked whether [the defendant's] discretionary duties included the administration of discipline." Harbert, 157 F.3d at 1282. Similarly, in assessing whether a police officer may assert qualified immunity against a Fourth Amendment claim, we do not ask whether he has the right to engage in unconstitutional searches and seizures, but whether engaging in searches and seizures in general is a part of his job-related powers and responsibilities. See, e.g., Madiwale v. Savaiko, 117 F.3d 1321, 1324 (11th Cir. 1997). Put another way, to pass the first step of the discretionary function test for qualified immunity, the defendant must have been performing a function that, but for the alleged constitutional infirmity, would have fallen with his legitimate job description.

Of course, we must be sure not to characterize and assess the defendant's act at too high a level of generality. Nearly every act performed by a government employee can be described, in general terms, as ostensibly "furthering the public interest." If we jump to such a high level of abstraction, it becomes impossible to determine whether the employee was truly acting within the proper scope of his job-related activities. Consequently, we consider a government official's actions at the minimum level of generality necessary to remove the constitutional taint. In

19

considering whether an act of allegedly excessive force fell within a police officer's duties, for example, we do not ask whether police have the right to use excessive force. We also do not immediately jump to a high level of generality and ask whether police are responsible for enforcing the law or promoting the public interest. We instead ask whether they have the power to attempt to effectuate arrests. See, e.g., Ferraro, 284 F.3d at 1194 (holding, in an excessive force suit, "there can be no doubt that [the police officer defendant] was acting in his discretionary capacity when he arrested [plaintiff]").

After determining that an official is engaged in a legitimate job-related function, it is then necessary to turn to the second prong of the test and determine whether he is executing that job-related function—that is, pursuing his job-related goals—in an authorized manner. The primary purpose of the qualified immunity doctrine is to allow government employees to enjoy a degree of protection only when exercising powers that legitimately form a part of their jobs. See, e.g., Harlow, 457 U.S. at 819 & n.34, 102 S. Ct. at 2739 & n.34 (limiting the availability of qualified immunity to situations where "an official's duties legitimately require action" and to "actions within the scope of an official's duties"). Each government employee is given only a certain "arsenal" of powers with which to accomplish her goals. For example, it is not within a teacher's

20

official powers to sign her students up for the Army to promote patriotism or civic virtue, or to compel them to bring their property to school to redistribute their wealth to the poor so that they can have firsthand experience with altruism.

Employment by a local, county, state, or federal government is not a carte blanche invitation to push the envelope and tackle matters far beyond one's job description or achieve one's official goals through unauthorized means.  Pursuing a job-related goal through means that fall outside the range of discretion that comes with an employee's job is not protected by qualified immunity.

Under this standard, Allred—as a matter of law—was undoubtedly engaged in a discretionary function in chastising Holloman for raising his fist during the Pledge of Allegiance and later referring him to Harland for punishment.  Though Allred is not empowered to violate constitutional rights as part of her official duties, she did have the responsibility of maintaining decorum in the classroom. The fact that she may have attempted to keep order in the classroom in an unconstitutional manner does not change the fact that she was fulfilling a legitimate job-related function.  Moreover, the ways in which she attempted to pursue this job-related goal (chastising Holloman and reporting him to the principal)—examined on a general level rather than in this specific application—were legitimate prerogatives of her job.  From an alternate

21

perspective, putting aside Holloman's First Amendment claim, Allred's actions would undoubtedly be considered part of her duties and legitimate exercises of her authority. Consequently, under the two-prong test articulated above, her activities in relation to the flag salute incident were discretionary acts for which she may seek qualified immunity.

For similar reasons, Harland is also potentially entitled to qualified immunity against Holloman's Speech Clause claims. Disciplining students is a legitimate discretionary function performed by principals, See Kirkland v. Greene County Bd. of Educ., 347 F.3d 903, 903 n.1 (11th Cir. 2003), and in the State of Alabama, spanking students is a legitimate part of a principal's "arsenal" for enforcing such discipline. Consequently, the burden shifts to Holloman to demonstrate that Allred and Harland are not entitled to summary judgment on qualified immunity grounds.

B.

As discussed earlier, once a defendant establishes that he was engaged in a discretionary function at the time of the acts in question, the burden shifts to the plaintiff to show that the defendant is not entitled to summary judgment on qualified immunity grounds. To do so, the plaintiff must demonstrate that a

22

reasonable jury could interpret the evidence in the record as showing that the defendant violated a constitutional right that was clearly established at the time of the acts in question.

We begin by examining Holloman's claim that Allred and Harland violated his First Amendment right to be free from compelled speech. Section 1 considers whether Holloman has successfully articulated a violation of a constitutional right, while Section 2 analyzes whether such a right was clearly established at the time of the incidents. Based on these discussions, we conclude that, interpreting the evidence in the light most favorable to Holloman, both Allred and Harland engaged in acts amounting to violations of Holloman's right to be free from compelled speech. Consequently, neither defendant is entitled to summary judgment on qualified immunity grounds against this Speech Clause claim.

1.

The Speech Clause of the First Amendment states, "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend I. The First Amendment, as incorporated through the Due Process Clause of the First Amendment, Near v. Minnesota, 283 U.S. 697, 707, 51 S. Ct. 625, 628, 75 L. Ed. 1357 (1931), applies to state and municipal governments, state-created entities,

and state and municipal employees, West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 637, 63 S. Ct. 1178, 1185, 87 L. Ed. 1628 (1943).

In Barnette, the Court held that the right to be free from compelled speech protects public school students from being forced to participate in the flag salute. It stated, "[T]he action of the local authorities in compelling the flag salute and pledge transcends constitutional limitations on their power and invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." Id. at 642, 63 S. Ct. at 1187.

Several pieces of evidence in the record support Holloman's contention that he was disciplined for failing to recite the Pledge of Allegiance. First, the day before the Holloman incident, John Michael Hutto was chastised in front of the class, sent to the Principal's office, threatened that his recommendation to the Air Force Academy would be revoked, and forced to apologize to his teacher and classmates, simply because he remained silent during the Pledge of Allegiance (without engaging in any affirmatively expressive activity). Second, Allred's deposition is replete with references to her "patriotism" and desire to see the American flag saluted in the "proper" or "normal" way; she was deeply offended by the notion of Americans not wanting to salute the flag.

Third, according to Holloman's affidavit, Harland interrupted Holloman's physics class to explicitly threaten that any students who refused to say the Pledge of Allegiance would be punished. Fourth, the affidavits of both Holloman and his mother state that he was told he was being punished for failing to salute the flag. Indeed, Harland told Holloman's mother during their phone conversation that he had to wait before disciplining Holloman because he was afraid that he (Harland) would hurt him. Consequently, there is more than enough evidence in the record to allow a reasonable jury to adopt this interpretation of events.

Allred's acts (if proven at trial), as a matter of law, violated Holloman's constitutional rights. First, according to Allred's own testimony, she instructed him that there were only two "permissible" ways of saying the pledge, and that any other way of doing so was prohibited. Second, she verbally chastised him in front of the class for his constitutionally protected actions (either failing to salute the flag or expressing his opinion in a non-disruptive fashion).

Verbal censure is a form of punishment, albeit a mild one. The intent behind this act was to dissuade him from exercising a constitutional right. She singled out Holloman in front of his entire class, subjecting him to embarrassment and humiliation. Given the gross disparity in power between a teacher and a student, such comments—particularly in front of the student's peers—coming

25

from an authority figure with tremendous discretionary authority, whose words carry a presumption of legitimacy, cannot help but have a tremendous chilling effect on the exercise of First Amendment rights.  See Riley v. Nat'l Fed'n of the Blind, 487 U.S. 781, 794, 108 S. Ct. 2667, 2676, 101 L. Ed. 2d 669 (1988) (invaliding a "scheme" that "must necessarily chill speech in direct contravention of the First Amendment's dictates"); Dickerson v. United States, 530 U.S. 428, 459, 120 S. Ct. 2326, 2344, 147 L. Ed. 2d 405 (2000) (Scalia, J., dissenting) ("[T]he Court has viewed the importation of 'chill' as itself a violation of the First Amendment.") (emphasis in original).  As in the Establishment Clause context, such "public pressure . . . can be as real as any overt compulsion," particularly in a "classroom setting, where . . . the risk of compulsion is especially high"; such measures may not be used to deter, even if "subtl[y] or indirect[ly]," the exercise of constitutional rights.  Lee v. Weisman, 505 U.S. 577, 593, 596, 112 S. Ct. 2649, 2658, 2660, 120 L. Ed. 2d 467 (1992).

Finally, Allred played a major role in the administration of Holloman's more formal punishment, his paddling.  She reported the incident to the principal with the intent and hope that Holloman be disciplined, was present during Holloman's questioning by Harland, did not object or attempt to dissuade Harland in any way, was present for the paddling, and manifested her approval of it

26

throughout the entire process. For similar reasons, Holloman has also adduced sufficient evidence to support his claim against Harland, the one who actually spanked him.

Having demonstrated that the record amply supports Holloman's contention that the defendants violated his constitutional right to be free from compelled speech, we now consider whether this right was clearly established at the time of the events in question.

2.

Barnette, 319 U.S. at 642, 63 S. Ct. at 1187, clearly and specifically established that schoolchildren have the right to refuse to say the Pledge of Allegiance. Under Barnette, any "reasonable person would have known" that disciplining Holloman for refusing to recite the pledge impermissibly chills his First Amendment rights. Thomas v. Roberts, 261 F.3d 1160, 1170 (11th Cir. 2001) (citation omitted). Consequently, on these alleged facts, Allred and Harland are not entitled to qualified immunity against Holloman's claims related to compelled speech. We reverse the district court's holding to the contrary.

27

Having assessed the viability of Holloman's First Amendment claim to be free from compelled speech, we now turn to Holloman's First Amendment claim to engage in affirmative expression.

## C.

One of Holloman's alternate bases for recovery under the First Amendment is that the defendants punished him for engaging in constitutionally protected speech. He maintains, in other words, that even if the defendants punished him for silently raising his fist during the Pledge of Allegiance—rather than for merely remaining silent during the pledge—his rights under the Speech Clause were still violated. The district court dedicated the overwhelming majority of its opinion regarding Allred and Harland to this argument, concluding that "[n]o jury could reasonably conclude that 'every like-situated, reasonable' teacher or principal would necessarily know that punishing Holloman for his unorthodox and deliberately provocative and disruptive gesture violated federal law . . . ." (Mem. Op., June 4, 2001, at 10).

We are again forced to reverse. Section 1 shows that the evidence (interpreted in Holloman's favor) demonstrates the existence of a limited constitutional right to engage in non-disruptive expression in a classroom

28

environment, while Section 2 demonstrates that this right was clearly established when the defendants chastised and punished him. Consequently, Allred and Harland are not entitled to summary judgment on qualified immunity grounds against Holloman's Speech Clause claim regarding his right to express himself.

1.

The Constitution guarantees students (and all people) the right to engage not only in "pure speech," but "expressive conduct," as well. See United States v. O'Brien, 391 U.S. 367, 376-77, 88 S. Ct. 1673, 1678-79, 20 L. Ed. 2d 672 (1968). In Spence v. Washington, 418 U.S. 405, 94 S. Ct. 2727, 41 L. Ed. 2d 842 (1974), the Supreme Court held that, to determine whether a particular act counts as expressive conduct, a court must determine whether "[a]n intent to convey a particularized message was present, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." Id. at 410-11, 94 S. Ct. at 2730. The Court later liberalized this test, however, emphasizing that "a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schonberg, or Jabberwocky verse of Lewis

29

Carroll." Hurley v. Irish-Am., Gay, Lesbian & Bisexual Group of Boston, Inc., 515 U.S. 557, 569, 115 S. Ct. 2338, 2345, 132 L. Ed. 2d 487 (1995). Thus, in determining whether conduct is expressive, we ask whether the reasonable person would interpret it as some sort of message, not whether an observer would necessarily infer a specific message.

At the very least, Holloman's gesture was expressive conduct. It is quite reasonable to infer that at least some students would have recognized his act for what it was—a protest over Allred's treatment of Hutto. Even if students were not aware of the specific message Holloman was attempting to convey, his fist clearly expressed a generalized message of disagreement or protest directed toward Allred, the school, or the country in general.

It is quite possible, however, that Holloman's act constituted "pure speech." As the Court suggested in O'Brien, 391 U.S. at 376, 88 S. Ct. at 1678, expressive conduct is an act with significant "'non-speech' elements," that is being used in a particular situation to convey a message. Holloman's act does not contain any of the substantive "non-speech" elements that are necessary to remove something from the realm of "pure speech" into the realm of expressive conduct. It seems as purely communicative as a sign-language gesture or the act of holding up a sign, and in this respect is similar to the wearing of a black armband, which the Tinker

30

Court found to be a "primary First Amendment right[] akin to 'pure speech.'" 393 U.S. at 508, 89 S. Ct. at 737.

It does not ultimately matter whether Holloman's act is characterized as "pure speech" or "expressive conduct" because this circuit appears to apply the same test in assessing school restrictions on either kind of expression. This Section summarizes these principles and applies them to the instant case.

a.

As with all rights, the scope of the First Amendment has boundaries. On many occasions, we have affirmed the right of public educational institutions "to adopt and enforce reasonable, non-discriminatory regulations as to the time, place and manner of student expressions and demonstrations." Bayless v. Martine, 430 F.2d 873, 878 (5th Cir. 1970). This "reasonableness" test is not the anemic simulacrum of a constraint on governmental power found in the Due Process Clause's "rational basis" test, see, e.g., Williamson v. Lee Optical, 348 U.S. 483, 487-88, 75 S. Ct. 461, 464, 99 L. Ed. 563 (1955), but rather a more robust notion of "reasonableness" such as that applied in the Fourth Amendment context, see U.S. Const. amend IV (prohibiting "unreasonable searches and seizures").

In Burnside v. Byars, we articulated the way to determine whether a public school regulation that curtailed expression was reasonable:

31

> [S]chool officials cannot ignore expressions of feelings with which they do not wish to contend. They cannot infringe on their students' right to free and unrestricted expression as guaranteed to them under the First Amendment to the Constitution, where the exercise of such rights in the school buildings and schoolrooms do[es] not materially and substantially interfere with the requirements of appropriate discipline in the operation of the school.

363 F.2d at 749. Under the Burnside standard, student expression may unquestionably be regulated when doing so "contributes to the maintenance of order and decorum within the educational system." Id. at 748; accord Tinker, 393 U.S. at 514, 89 S. Ct. at 740 (holding that a school may not prohibit expressive activity unless there are "facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities"); Shanley, 462 F.2d at 969 ("The test for curtailing in-school exercise of expression is whether or not the expression or its method of exercise 'materially and substantially' interferes with the activities or discipline of the school."). This doctrine allows school authorities to prohibit, among other things, "lewd, indecent, or offensive speech . . . . The First Amendment does not prevent the school officials from determining that to permit a vulgar and lewd speech such as respondent's would undermine the school's basic educational mission." Bethel Sch. Dist. v. Fraser, 478 U.S. 675, 683, 685, 106 S. Ct. 3159, 3164-65, 92 L. Ed. 2d 549 (1986); see also Healy v. James, 408 U.S. 169, 189, 92 S. Ct. 2338, 2350,

32

33 L. Ed. 2d 266 (1972) ("[First Amendment] [a]ssociational activities need not be tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education.").

However, in assessing the reasonableness of regulations that tread upon expression, we cannot simply defer to the specter of disruption or the mere theoretical possibility of discord, or even some de minimis, insubstantial impact on classroom decorum. Particularly given the fact that young people are required by law to spend a substantial portion of their lives in classrooms, student expression may not be suppressed simply because it gives rise to some slight, easily overlooked disruption, including but not limited to "a showing of mild curiosity" by other students, see Burnside, 363 F.2d at 748, "discussion and comment" among students, Reineke v. Cobb Cty. Sch. Dist., 484 F. Supp. 1252, 1261 (N.D. Ga. 1980), or even some "hostile remarks" or "discussion outside of the classrooms" by other students, Tinker, 393 U.S. at 508, 514, 89 S. Ct. at 737, 740. For example, one district court correctly found that a teacher was unjustified in censoring an article in the school newspaper because it was "inconceivable that the use of the word 'damn' one time in the newspaper would have caused material

and substantial interference with school activities." Reineke, 484 F. Supp. at 1258.

The dissent concludes that Holloman's gesture was unprotected because "[t]he students' comments [to Allred after class] demonstrate that they at least focused their attention during a portion of the recitation of the Pledge on Holloman's fist . . . rather than on the planned curriculum of saying the Pledge." This approach appears to ignore the principle discussed above that student expression must cause (or be likely to cause) a "material[] and substantial[]" disruption, Burnside, 363 F.2d at 749, and more than a brief, easily overlooked, de minimum impact, before it may be curtailed. The dissent argues that Holloman's act was "meant to compete for students' attention." The same can be said of any of the forms of student expression that have been found to be protected, including the wearing of armbands or buttons in class. A student expressing himself in those ways clearly intends to attract the other students' attention and have them consider, however briefly, the meaning behind the symbolism. Indeed, if a student's attention is never focused, if even for a moment, on the expression, it becomes pointless. Under the dissent's approach, where schools may prohibit any speech or acts that do anything to distract a student's mind—however briefly or

insubstantially—from the planned curriculum, constitutional protection for student expression by definition would be eliminated.

This point was made quite clearly in Parducci v. Rutland, 316 F. Supp. 352 (M.D. Ala. 1970), where a teacher was terminated because she assigned a short story that school administrators found offensive. The district court recognized that First Amendment freedoms in public schools, including a teacher's right to academic freedom, could be constitutionally abridged under Tinker and Burnside only if there was a realistic threat that the conduct at issue would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." Id. at 355. The court, correctly applying our precedents, held:

> Rather than there being a threatened or actual substantial disruption to the educational processes of the school, the evidence reflects that the assigning of the story was greeted with apathy by most of the students. Only three of plaintiff's students asked to be excused from the assignment. On this question of whether there was a material and substantial threat of disruption, the Principal testified at the School Board hearing that there was no indication that any of plaintiff's other 87 students were planning to disrupt the normal routine of the school. This Court now specifically finds and concludes that the conduct for which plaintiff was dismissed was not such that "would materially and substantially interfere with" reasonable requirements of discipline in the school.

35

Id. at 356. There is no evidence in the record to suggest that Holloman's gesture caused any more disturbance or unrest than Parducci's assignment. By focusing entirely on whether students may have been momentarily "distracted," rather than on whether the distraction or disruption was "material" or "substantial," the dissent gives insufficient protection to students' First Amendment rights and incorrectly applies our precedents.

While certain types of expression unquestionably cause enough of a threat of disruption to warrant suppression even before negative consequences occur, "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression," even in schools. Tinker, 393 U.S. at 508, 89 S. Ct. at 737. "[T]here must be demonstrable factors that would give rise to any reasonable forecast by the school administration of 'substantial and material' disruption of school activities before expression may be constitutionally restrained." Shanley, 462 F.2d at 974; accord Marshall, 337 F. Supp. at 135 (suggesting that a "speculative fear" is insufficient to justify restrictions on student expression, but a "real and immediate fear of conduct potentially disruptive of the university routine" is enough).

We recognize that this test is more restrictive than the parsimonious interpretation of students' First Amendment freedoms offered in Ferrell v. Dallas

Indep. Sch. Dist., 392 F.2d 697 (5th Cir. 1968). In Ferrell, a high school principal suspended students in a rock-and-roll band for growing their hair too long. This court upheld the principal's regulation because the principal felt "that the length and style of the boys' hair would cause commotion, trouble, distraction, and a disturbance in the school . . . ." Id. at 699. To the degree this ruling is based on the principal's abstract concerns, it is patently inconsistent with the principle articulated in Tinker, Burnside, and numerous other cases discussed throughout this Subsection, that there must be a real or substantial threat of actual disorder, as opposed to the mere possibility of one. We are bound to follow Burnside rather than Ferrell because it is the earlier case. See Local Union 48 Sheet Metal Workers v. S.L. Pappas & Co., 106 F.3d 970, 975 (11th Cir. 1997). Similarly, we must follow Tinker rather than Ferrell because it is an intervening, inconsistent Supreme Court decision. See Lufkin v. McCallum, 956 F.2d 1104, 1107 (11th Cir. 1992). Consequently, we apply the Tinker-Burnside doctrine in this case.

This Tinker-Burnside standard we reaffirm today was applied in Banks v. Bd. of Public Instr., 314 F. Supp. 285 (S.D. Fla. 1970), vacated by 401 U.S. 988, 91 S. Ct. 1223, 28 L. Ed. 2d 526 (1971), reinstated without published opinion by dist. ct. and aff'd, 450 F.2d 1103 (5th Cir. 1971), a case similar to this one, where a student was suspended for failing to stand during the Pledge of Allegiance. The

37

district court held, "The conduct of Andrew Banks in refusing to stand during the pledge ceremony constituted an expression of his religious beliefs and political opinions. His refusal to stand was no less a form of expression than the wearing of the black armband was to Mary Beth Tinker. He was exercising a right 'akin to pure speech.'" Id. at 295. While at first glance it might seem like Banks's right to be free from compelled speech was at issue in that case, the above quote from the district court makes clear that its ruling was not based on Banks's First Amendment right to remain silent, but his First Amendment right to affirmatively express himself. Both the school administration and the court in that case perceived Banks's act of remaining seated while everyone else was standing as an expressive act, rather than a mere refusal to speak. In upholding his right to act in such a way, the district court observed, "The unrefuted testimony clearly reflects that the plaintiff's refusal to stand has not caused any disruption in the educational process." Id.; cf. Jenkins v. Louisiana State Bd. of Educ., 506 F.2d 992 (5th Cir. 1975) (upholding restrictions on college students' activities because "[t]he actions of appellants resulted in a material disruption of the campus and of the rights of others. They were not protected by the First Amendment."). We therefore find Banks to be fully consistent with the approach mandated by Burnside and Tinker, and conclude that Holloman's gesture was sufficiently akin to Banks's refusal to

38

stand (in that neither had any real impact on class discipline) as to be entitled to First Amendment protection.

Our cases involving "freedom buttons" are perhaps even more instructive. In Blackwell v. Issaquena Cty. Bd. of Educ., 363 F.2d 749 (5th Cir. 1966), black elementary school students wore "freedom buttons" to class in support of the civil rights movement.

> [S]ome of these students were creating a disturbance by noisily talking in the hall when they were scheduled to be in class . . . . [Some students] accosted other students by pinning the buttons on them even though they did not ask for one. One of the students tried to put a button on a younger child who began crying. This activity created a state of confusion, disrupted class instruction, and resulted in a general breakdown of orderly discipline.

Id. at 750-52 (footnote omitted). We held that the principal did not violate the students' constitutional rights by punishing them for their behavior and, under those circumstances, banning the buttons from the school. Such a restriction on student expression was justified, notwithstanding the First Amendment, because the "students conducted themselves in a disorderly manner, disrupted classroom procedure, interfered with the proper decorum and discipline of the school and disturbed other students who did not wish to participate in the wearing of the buttons." Id. at 753.

In Burnside, however, the same panel of this court, on the same day, emphasized that the mere possibility of such consequences did not justify a different school in banning freedom buttons. 363 F.2d at 748 (overturning school's ban on freedom buttons because "affidavits and testimony before the District Court reveal no interference with educational activity and do not support a conclusion that there was a commotion or that the buttons tended to distract the minds of the students away from their teachers") (emphasis omitted). The Burnside-Blackwell dyad demonstrates that the permissibility of a restriction on student expression cannot be determined in the abstract, but must be assessed with at least one eye toward the actual or likely (not merely potential) impact of that expression on the learning environment. Conduct that may be constitutionally protected in one school or under one set of circumstances may tend to incite disruption or disorder—and so be constitutionally proscribable—in others. Where students' expressive activity does not materially interfere with a school's vital educational mission, and does not raise a realistic chance of doing so, it may not be prohibited simply because it conceivably might have such an effect.

b.

Allred maintains that it was appropriate for her to discipline Holloman because the other students were disturbed by his demonstration. She claims a

40

number of them came up to her after class and told her that what he did wasn't "right." She also expressed concern that his behavior would lead to further disruptions by other students.

The fact that other students may have disagreed with either Holloman's act or the message it conveyed is irrelevant to our analysis. See Tinker, 393 U.S. at 509, 89 S. Ct. at 738 ("In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."); Near v. Minnesota, 283 U.S. 697, 722, 51 S. Ct. 625, 633, 75 L. Ed. 2d 1357 (1931) ("If the township may prevent the circulation of a newspaper for no reason other than that some of its inhabitants may violently disagree with it, and resent its circulation by resorting to physical violence, there is no limit to what may be prohibited.") (quotation and citation omitted).

Nor is Holloman's expression removed from the realm of constitutional protection simply because the students cloaked their disagreement in the guise of offense or disgust. Holloman's behavior was not directed "toward" anyone or any group and could not be construed by a reasonable person (including a high school student) as a personal offense or insult.

Ferrell v. Dallas Indep. Sch. Dist. arguably supports Allred's position. In Ferrell, this court held that a school could prohibit students from wearing long hair simply because their choice of hairstyle "provoked" other students into breaking school rules and the law by responding violently. The court justified the hair-length regulation by pointing to such considerations:

> On one occasion a group of boys in his school had decided that a classmate's hair was too long and that they were going to take the matter in their own hands and trim it themselves. Mr. Lanham stated that boys with long hair were subjected to substantial harassment. Obscene language had been used by some students in reference to others with long hair and girls had come to his office complaining about the language being used. The long hair boys had also been challenged to a fight by other boys who did not like long hair. Also, long hair boys had been told by others that the girl's restroom was right down the hall.

392 F.2d at 700-01.

Allowing a school to curtail a student's freedom of expression based on such factors turns reason on its head. If certain bullies are likely to act violently when a student wears long hair, it is unquestionably easy for a principal to preclude the outburst by preventing the student from wearing long hair. To do so, however, is to sacrifice freedom upon the alter of order, and allow the scope of our liberty to be dictated by the inclinations of the unlawful mob. If bullies disrupted classes and beat up a student who refused to join the football team, the proper

42

solution would not be to force the student to join the football team, but to protect the student and punish the bullies. If bullies disrupted classes and beat up a student because he wasn't wearing fancy enough clothes, the proper solution would not be to force the student to wear Abercrombie & Fitch or J. Crew attire, but to protect the student and punish the bullies. The same analysis applies to a student with long hair, who is doing nothing that the reasonable person would conclude is objectively wrong or directly offensive to anyone. The fact that other students might take such a hairstyle as an incitement to violence is an indictment of those other students, not long hair.

Such reasoning is part of the basis for Street v. New York, 394 U.S. 576, 592, 89 S. Ct. 1354, 1365, 22 L. Ed. 2d 572 (1969), where the Supreme Court held that "the possible tendency of appellant's words to provoke violent retaliation" is not a basis for banning those words unless they are "fighting words." Street's conviction was reversed because "[t]hough it is conceivable that some listeners might have been moved to retaliate upon hearing appellant's disrespectful words, we cannot say that appellant's remarks were so inherently inflammatory as to come within that small class of 'fighting words' which are 'likely to provoke the average person to retaliation, and thereby cause a breach of the peace.'" Id. (quoting Chaplinsky v. New Hampshire, 315 U.S. 568, 574, 62 S. Ct. 766, 770, 86

43

L. Ed. 1031 (1942)); see also Cantwell v. Connecticut, 310 U.S. 296, 308-10, 60 S. Ct. 900, 905-06, 84 L. Ed. 1213 (1940) (reversing conviction for breaching the peace in a case where there was "no assault or threatening of bodily harm, no truculent bearing, no intentional discourtesy, no personal abuse").

While the same constitutional standards do not always apply in public schools as on public streets, we cannot afford students less constitutional protection simply because their peers might illegally express disagreement through violence instead of reason. If the people, acting through a legislative assembly, may not proscribe certain speech, neither may they do so acting individually as criminals. Principals have the duty to maintain order in public schools, but they may not do so while turning a blind eye to basic notions of right and wrong.

Thus, under the Tinker-Burnside doctrine, we are required to reject this portion of Ferrell, as well. Even if Allred were correct in fearing that other students may react inappropriately or illegally, such reactions do not justify suppression of Holloman's expression. Holloman's expression was constitutionally protected because the record reveals no way in which he "materially and substantially interfere[d] with the requirements of appropriate discipline in the operation of the school." Burnside, 363 F.2d at 749.

c.

On appeal, Allred repeatedly emphasizes that Holloman was punished not for his act, but for disobeying directions from her and Harland as to the only permissible ways to salute the flag. By raising his fist in the air the next day, Holloman contravened these instructions. Consequently, Allred argues, Holloman was punished for insubordination for violating these orders, rather than for exercising a First Amendment right.

Although Holloman failed to salute the flag in a manner amenable to Allred, "the protections of the First Amendment do not extend solely to speech which is well-mannered and attentive to the preferences of others." Sabel v. Stynchcombe, 746 F.2d 728, 731 (11th Cir. 1984). As discussed throughout this Subsection, Holloman had the constitutional right to raise his fist during the Pledge of Allegiance so long as he did not disrupt the educational process or the class in any real way.

Allred could not prevent Holloman from exercising a constitutional right simply by telling him not to do so. School officials may not punish indirectly, through the guise of insubordination, what they may not punish directly. See Rutland, 316 F. Supp. at 358 (ordering reinstatement of public high school teacher who was dismissed in violation of the First Amendment for assigning a short story

45

administrators found objectionable because "plaintiff's 'insubordination' was not insubordination in any sense and was not, in reality, a reason for the School Board's action"); Dickey v. Alabama State Bd. of Educ., 273 F. Supp. 613, 618 (M.D. Ala. 1967) ("The attempt to characterize Dickey's conduct, and the basis for their action in expelling him, as 'insubordination' requiring rather severe disciplinary action, does not disguise the basic fact that Dickey was expelled from Troy State College for exercising his constitutionally guaranteed right of academic and/or political expression."), vacated as moot sub nom. Troy State Univ. v. Dickey, 402 F.2d 515 (5th Cir. 1968). Allred lacked the right to proscribe his behavior in the first place; neither she nor Harland could punish Holloman for violating a directive that was a constitutional nullity.

Consequently, we have no choice but to conclude as a matter of law that Holloman successfully articulated a violation of his First Amendment right to freedom of expression by Harland and Allred. We now must assess whether these rights were "clearly established" at the time of the incidents.

2.

This circuit was recently chastised by the Supreme Court for taking an unwarrantedly narrow view of the circumstances in which public officials can be

held responsible for their constitutional violations. See Vaughan v. Cox, 343 F.3d 1323, 1332 (11th Cir. 2003) ("[T]he Supreme Court in Hope cautioned that we should not be unduly rigid in requiring factual similarity between prior cases and the case under consideration."). The law of this circuit used to be that a government actor could be denied qualified immunity only for acts that are "so obviously wrong, in light of the pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing." Lassiter v. Alabama A. & M. Univ., 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc). The Supreme Court, specifically citing Lassiter (along with a handful of other Eleventh Circuit cases), held that "[t]his rigid gloss in the qualified immunity standard . . . is not consistent with [the Supreme Court's] cases." Hope v. Pelzer, 536 U.S. 730, 739 & n.9, 122 S. Ct. 2508, 2515 & n.9, 153 L. Ed. 2d 666 (2002).

While officials must have fair warning that their acts are unconstitutional, there need not be a case "on all fours," with materially identical facts, before we will allow suits against them. A principle of constitutional law can be "clearly established" even if there are "notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct at issue violated constitutional rights."

47

United States v. Lanier, 520 U.S. 259, 269, 117 S. Ct. 1219, 1227, 137 L. Ed. 2d 432 (1997); Hope, 538 U.S. at 741, 122 S. Ct. at 2516 ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances. Indeed, in Lanier, we expressly rejected a requirement that previous cases be 'fundamentally similar.'").

> In our pre-Hope jurisprudence, we held that
>
> [g]eneral rules, propositions, or abstractions . . . do not determine qualified immunity. Instead, the circumstances that confronted the government actor must have been materially similar to prior precedent to constitute clearly established law because public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases. For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances.

Wood v. City of Lakeland, 203 F.3d 1288, 1291-92 (11th Cir. 2000) (citations and quotations omitted).

As discussed above, Hope reminds us that we need no longer focus on whether the facts of a case are "materially similar to prior precedent." Moreover, Hope emphasized that "general statements of the law are not inherently incapable of giving fair and clear warning . . . [A] constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question,

48

even though the very action in question has [not] previously been held unlawful." 536 U.S. at 741, 122 S. Ct. at 2516 (quotations omitted). Thus, we do not just compare the facts of an instant case to prior cases to determine if a right is "clearly established;" we also assess whether the facts of the instant case fall within statements of general principle from our precedents. See Vinyard v. Wilson, 311 F.3d 1340, 1351 (11th Cir. 2002) ("When looking at case law, some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts.").

Hope seems to have abrogated many of the other standards articulated in Wood, as well. For example, Wood's requirement that a particular conclusion must be "dictate[d], that is, truly compel[led]" intimates a level of absolute crystal-clear certainty about precedent that forms no part of Hope's requirements. To the degree there exists a conflict between Hope and our earlier cases, we are, of course, bound to follow the Supreme Court's intervening ruling. See Lufkin v. McCallum, 956 F.2d 1104, 1107 (11th Cir. 2000). Since Hope, many of our cases have applied its standard to the exclusion of our earlier, more rigorous doctrinal tests. See, e.g., Holmes v. Kucynda, 321 F.3d 1069, 1077-78 (11th Cir. 2003); Dahl v. Holley, 312 F.3d 1228, 1233 (11th Cir. 2002); Weaver v. Bonner, 309 F.3d 1312, 1324 (11th Cir. 2002). Hope emphasizes that, notwithstanding more

49

stringent standards articulated in some of our earlier cases, "the salient question . . . is whether the state of the law [at the time of the events in question] gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional." 536 U.S. at 741, 122 S. Ct. at 2516.

Turning to Holloman's claims, we find that, as of May 16, 2000, the Tinker-Burnside standard was clearly established and sufficiently specific as to give the defendants "fair warning" that their conduct was constitutionally prohibited. We do not find it unreasonable to expect the defendants—who holds themselves out as educators—to be able to apply such a standard, notwithstanding the lack of a case with material factual similarities. While we have not traditionally called upon government officials to be "creative or imaginative" in determining the scope of constitutional rights, see Adams v. St. Lucie Cty. Sheriff's Dep't, 962 F.2d 1563, 1575 (11th Cir. 1992) (Edmondson, J., dissenting), neither are they free of the responsibility to put forth at least some mental effort in applying a reasonably well-defined doctrinal test to a particular situation. Our precedents would be of little value if government officials were free to disregard fairly specific statements of principle they contain and focus their attention solely on the particular factual scenarios in which they arose.

The Tinker-Burnside test calls for teachers to assess two factors: (1) whether a student is engaged in expression (either pure speech or expressive conduct) and (2) whether the expression is having a non-negligible disruptive effect, or is likely to have such an effect, on classroom order or the educational process. The first factor is quite easy to apply; the test for determining whether an act constitutes expressive conduct is whether the "reasonable person" would perceive it as such. See Spence, 418 U.S. at 410-11, 94 S. Ct. at 2730. Consequently, a teacher or principal should have no problem determining whether a student is engaged in expression. Indeed, given the myriad forms of expression, we should be hesitant about requiring that a means of expression be the subject of a previous case before offering the speaker full § 1983 protection.

The second factor should also be quite effortless for an educator to apply. A teacher or principal should be able to instantly recognize whether a student is disrupting class, and it should not be too hard to determine whether a student's activities are likely to have such an effect. Consequently, we do not find the Tinker-Burnside test to be of such an unreasonable level of generality that Allred and Harland could not have been expected to apply it in this case. Cf. Thomas v. Roberts, 323 F.3d 950 (11th Cir. 2003) ("[W]here the applicable legal standard is a highly general one, such as 'reasonableness,' preexisting caselaw that has

51

applied general law to specific circumstances will almost always be necessary to draw a line that is capable of giving fair and clear notice that an official's conduct will violate federal law."). Because this standard is "clearly established," is not at an unreasonable high level of generality, and when applied to the facts of Holloman's case yields a fairly determinate result that should have been clear, Allred and Harland are not entitled to summary judgment on qualified immunity grounds against Holloman's Speech Clause claim concerning his right to affirmative expression. The Tinker-Burnside principle gave them "clear notice" that their conduct violated Holloman's constitutional rights; unlike the dissent, we believe that teachers are well equipped to "readily determine what conduct falls within" the Tinker-Burnside standard.

Indeed, Holloman's right to silently raise his fist during the Pledge of Allegiance would even be considered "clearly established" under Barnette. As discussed earlier, he clearly had the right to remain silent during the Pledge of Allegiance; we would be very reluctant to conclude that Holloman somehow shed the protection of the First Amendment simply by lifting his fist into the air while exercising this right. Allred and Harland are essentially asking us to distinguish, on constitutional grounds, between a student with his hands in his pockets or at his

sides (like Hutto) and a student with his hand in the air. This is a hair we will not split; First Amendment protections are not lost that easily.

D.

The dissent takes issue with the analysis in Subpart C, contending that Holloman's expression is unprotected because it "is the sort of activity that competes with the teacher for the students' attention." For the reasons discussed in the previous Subpart, we do not believe that Holloman's activity, which had virtually no impact on the class, was sufficient under <u>Tinker</u> and <u>Burnside</u> to fall outside the realm of constitutional protection. However, even if we (or a jury, based on the facts as they unfold at trial) were to find that Holloman's expression did "materially and substantially interfere with the requirements of appropriate discipline," Holloman would still be able to articulate a violation of his First Amendment rights.

One of the most egregious types of First Amendment violations is viewpoint-based discrimination. <u>See</u> <u>Chandler v. James</u>, 180 F.3d 1254, 1265 (11th Cir. 1999) (noting that "viewpoint discrimination[] [is] the most egregious form of content-based censorship"); <u>Searcey v. Harris</u>, 888 F.2d 1314, 1324 (11th Cir. 1989) ("The prohibition against viewpoint discrimination is firmly embedded

53

in first amendment analysis."). Government actors may not discriminate against speakers based on viewpoint, even in places or under circumstances where people do not have a constitutional right to speak in the first place. See Uptown Pawn & Jewelry, Inc. v. City of Hollywood, 337 F.3d 1275, 1277 (11th Cir. 2003) ("[R]estrictions on nonpublic forums need only be reasonable and not viewpoint discriminatory."); Adler v. Duval County Sch. Bd., 206 F.3d 1070, 1081 (11th Cir. 2002) ("The Supreme Court has consistently held that in nonpublic fora the government may not engage in viewpoint discrimination."). We have expressly recognized that this fundamental prohibition against viewpoint-based discrimination extends to public schoolchildren, as well, stating, "[W]e do not believe [that Supreme Court precedent] offers any justification for allowing educators to discriminate based on viewpoint. . . . Without more explicit direction, we will continue to require school officials to make decisions relating to speech which are viewpoint neutral." Searcey, 888 F.2d at 1325. Consequently, even if Holloman did not have the right to express himself in the manner he did, his rights were still violated if he was punished because Allred disagreed or was offended by what he said.

This theory was most clearly applied in R.A.V. v. St. Paul, 505 U.S. 377, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992). That case involved an ordinance

54

which made it a crime to place a "burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender." Id. at 380, 112 S. Ct. at 2541. The Supreme Court accepted the Minnesota Supreme Court's construction of the statute as prohibiting only "fighting words," a constitutionally proscribable category of expression. Id. at 380-31, 112 S. Ct. at 2541. The Court nevertheless invalidated the statute because, in the course of prohibiting conduct the state had the right to criminalize, it made a viewpoint-based distinction.

The Court acknowledged that people do not have the First Amendment right to use fighting words. Id. at 382, 112 S. Ct. at 2542-43. The Court emphasized, however, "What [that] means is that these areas of speech can, consistently with the First Amendment, be regulated because of their constitutionally proscribable content (obscenity, defamation, etc.)—not . . . that they can be made the vehicles for content discrimination unrelated to their distinctively proscribable content." Id. at 383, 112 S. Ct. at 2543. Thus,

> a particular instance of speech can be proscribable on the basis of one feature (e.g. obscenity) but not on the basis of another (e.g. opposition to the city government) . . . . [Moreover,] the power to proscribe particular speech on the basis of a noncontent element (e.g. noise) does not entail the power to proscribe the same speech on the basis of a content element . . . .

Id. at 385-86, 112 S. Ct. at 2544. Applying this standard, the Court held that the ordinance was unconstitutional because "[d]isplays containing abusive invective, no matter how vicious or severe, are permissible unless they are addressed to one of the specified disfavored topics." Id. at 391, 112 S. Ct. at 2547. Moreover, the ordinance went beyond general content discrimination "to actual viewpoint discrimination. . . . '[F]ighting words' that do not themselves invoke race, color, creed, religion, or gender . . . would seemingly be usable ad libitum in the placards of those arguing in favor of racial, color, etc., tolerance and equality, but could not be used by those speakers' opponents." Id. at 391, 112 S. Ct. at 2547-48.

Thus, even though Minneapolis had the unquestioned power to prohibit fighting words, it could not draw viewpoint based distinctions by targeting certain fighting words because of the repugnant message they conveyed. Applying this principle to the instant case, it becomes clear why Allred may potentially be held liable under the First Amendment even if Holloman was not engaging in constitutionally protected speech. Although Allred has the authority under the Tinker-Burnside standard to proscribe student expression that materially and substantially disrupts the class, she may not punish such expression based on the fact that she disagrees with it. Even when engaging in speech that is not directly

constitutionally protected, Holloman still has the First Amendment right to be free from viewpoint discrimination.

The record, interpreted in the light most favorable to Holloman, more than amply supports his argument that he was punished for the substance of his unpatriotic views rather than an alleged disruption of class. Allred admitted in her deposition that when Hutto simply refused to recite the pledge of allegiance, she was "hurt" and "[v]ery disappointed in him" because "[h]e was a leader of the class . . . . [and] looked up to a great deal." Moreover, she because of "the freedoms we enjoy in this country," she couldn't understand how he wouldn't want to pledge. She emphasized, "It broke my heart, you know." Given that Hutto was chastised and ultimately forced by Harland to apologize simply for remaining silent during the flag salute, a jury could reasonably conclude that Allred's punishment of Holloman was based on similar motivations.

When Holloman allegedly asked Allred about the ways in which students were permitted to salute the flag, she told him that he could either do so with his hand over his heart or in a military-type salute. She explained, "In our country, the normal way is putting your hand over your heart. That's the way you see everyone do it, the ball players on TV." Any other way is prohibited because it "is not the normal acceptance [sic] of saying the pledge in our country." She considered what

57

he did "disrespectful" because "[i]t's going against the normal procedure behavior [sic] of pledging to our American flag." Holloman's gesture is "not an acceptable behavior in this country." She emphasized, "You just salute the way Americans salute and pledge. That's a given." Although she maintained that this disrespect to the flag wasn't the reason she actually punished Holloman, these statements would allow a jury to conclude that her actions were motivated by her disagreement with and offense at the unpatriotic views expressed by Holloman's gesture.

Harland expressed a similar attitude. According to Vice Principal Jason Adkins, Harland was "angry and disappointed and upset" that Hutto declined to salute the American flag. Harland threatened to rescind his recommendation of Hutto to the Air Force Academy. Again, such views toward the Pledge of Allegiance support Holloman's claim that he was punished for the offensive viewpoint he expressed.

Especially when considered in light of the virtually nonexistent evidence that Holloman disrupted the class in any way (discussed in the previous Subpart), the record virtually compels the conclusion (for summary judgment purposes) that both the fact and extent of his punishment stemmed from the fact that Allred and Harland found his ostensibly unpatriotic views repugnant and offensive. Indeed,

58

many of our cases have used evidence such as this to support a finding that a particular governmental act was motivated by unconstitutional viewpoint discrimination. See, e.g., Chandler v. Georgia Public Telecomm. Comm'n, 917 F.2d 486, 491-92 ("The transcript of the evidentiary hearing held by the district court is replete with statements by Dr. Cooper, the executive director of [the state agency], that [the agency] decided that the viewpoints of the Libertarians were less valuable than those of the Democrats and Republicans.").

As emphasized earlier, the evidence at trial may prove that Allred did not discipline Holloman because of his viewpoint, but for a legitimate reason. Interpreting the evidence in Holloman's favor for summary judgment purposes, however, we must conclude that her motive was discriminatory. Because Holloman had the right to be free from viewpoint discrimination, and that right was clearly established (both in general as well as in the public school context) under the precedents discussed above, we must deny Allred qualified immunity at this stage. As Justice Blackmun reminds us, "[I]f educators intentionally may eliminate all diversity of thought, the school will strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." Bd. of Educ. v. Pico, 457 U.S. 853, 879, 102 S. Ct. 2799, 2814, 73 L. Ed. 2d 435 (1982) (Blackmun, J., concurring in part). Consequently, even if the

59

dissent's contention (that Holloman's conduct is not protected under the Tinker-Burnside standard) is correct, Holloman's punishment would still have violated the First Amendment. Viewpoint discrimination is another First-Amendment avenue for recovery that Holloman is entitled to pursue at trial.

————

Having concluded that Allred and Harland are not entitled to summary judgment on qualified immunity grounds against any of the three ways in which Holloman can articulate Speech Clause claims against them, we now turn to his Establishment Clause claim against them.

III.

Holloman claims that his rights under the Establishment Clause were violated by Allred's daily moment of silent prayer. The district court granted both Allred and Harland summary judgment against this claim. While Holloman's brief on appeal vigorously contests this ruling as it applies to Allred, he does not even mention whether Harland was entitled to qualified immunity on this claim. Consequently, we are forced to conclude that Holloman has abandoned his appeal regarding Harland's summary judgment on qualified immunity grounds against

Holloman's Establishment Clause claim.[9]  We reverse the district court's grant of summary judgment on this claim to Allred, however.

As noted in Part II, the first step in assessing the viability of a qualified immunity defense is to determine whether the government official defendant was engaged in a "discretionary function" in performing the acts of which the plaintiff complains.  This entails a two-step analysis: we begin by ascertaining whether the defendant was pursuing a job-related goal, and then examine whether the type of action in which she was engaging to further this goal was authorized.

We are willing to assume that Allred satisfies the first prong of this test because she was attempting to pursue the legitimate job-related function of fostering her students' character education by teaching compassion.  She nevertheless fails the second prong of the "discretionary function" test because she was not pursuing this job-related goal through legitimate means that fell within her powers.  While fostering character development and moral education were undoubtedly parts of Allred's official responsibilities, this does not automatically

---

[9] Based on the record before us, it appears as if Holloman would be able to articulate a number of ways in which Harland could be held liable under a supervisoral theory of liability.  As discussed earlier, qualified immunity is not a defense to a § 1983 suit premised on supervisoral liability.  Because Holloman failed to articulate such a cause of action at any point before the district court, we need not consider the viability of such claims here.

empower her to do anything within her judgment that furthers those goals; she cannot educate students at all costs.

Praying goes sufficiently beyond the range of activities normally performed by high school teachers and commonly accepted as part of their job as to fall outside the scope of Allred's official duties, even if she were using prayer as a means of achieving a job-related goal. It is not within the range of tools among which teachers are empowered to select in furtherance of their pedagogical duties.[10] Prayer is a relatively sui generis activity. Put another way, even ignoring Holloman's Establishment Clause claims, praying still would not be part of a public school teacher's responsibilities or duties.

We emphasize that, at this juncture, we are not denying Allred summary judgment on qualified immunity grounds against this claim because we feel her acts violated the Establishment Clause. Instead, we are holding her ineligible for qualified immunity as a matter of law because she failed to establish that her act—this type of act— fell within her duties or powers as a teacher. The fact that Allred is a teacher does not mean that anything she says or does in front of a

_____

[10] We emphasize that students were not studying the Bible as part of a course on literature, or singing a religious hymn in a music class, or analyzing a prayer as a poem, but instead were actually encouraged to pray. Cf. Stone v. Graham, 449 U.S. 39, 42, 101 S. Ct. 192, 194, 66 L. Ed. 2d 199 (1980) ("This is not a case in which the Ten Commandments are integrated into the school curriculum, where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like.").

classroom necessarily constitutes an exercise of her discretionary powers or is a job-related function. Prayer is distinct from the type of civil virtue and secular moralism Alabama sought to promote through its character education program. Consequently, Allred is not even potentially entitled to summary judgment on qualified immunity grounds against Holloman's Establishment Clause claim.

The dissent takes issue with this conclusion, concluding that school prayer is a type of act that falls within the scope of a public school teacher's discretionary authority. It argues, "It was certainly within the scope of a public high school teacher's authority to lead students in prayer prior to 1962, when the Court ruled that teacher led prayer in public schools is a violation of the Establishment Clause." This analysis is beside the point. In determining whether a public official is authorized to perform a certain type of act (abstracting away from its unconstitutional aspects), we look to the scope of their authority as it exists today, and do not inquire as to what the forty-year old root causes of the present-day situation may have been. Prayer is not a type of act that falls within a reasonably specific category of actions that teachers are authorized to perform; there is no easy way of abstracting away its unconstitutional aspects to arrive at a type of behavior that falls within teachers' discretionary authority.

Moreover, we decline to embark on a sociological inquiry—one for which this court is singularly unequipped—in which we weigh Supreme Court rulings against other important stimuli that has led to the gradual secularization of this country over the past half century to determine why prayer is not a type of act that public school teachers are empowered to perform. Consequently, Allred acted outside her discretionary authority and is not even potentially eligible to invoke qualified immunity against Holloman's Establishment Clause claims.

IV.

The district court granted Allred summary judgment on qualified immunity grounds against Holloman's Establishment Clause claims because it concluded that her daily moment of silent prayer did not violate Holloman's constitutional rights, and that even if it did, those rights were not clearly established at the time of the incident. In Part III, we reversed the court's grant of qualified immunity because Allred had failed to establish that she had been performing a discretionary function in conducting this moment of silent prayer. In this Part, we conclude that Holloman demonstrated sufficient evidence to support the conclusion that Allred had violated clearly established rights under the Establishment Clause. We include this discussion as a preface to Part V, where we assess the liability of the

64

School Board. Logically enough, the only way Holloman can maintain his Establishment Clause suit against the School Board is if he demonstrates, as a threshold matter, that his Establishment Clause rights were violated.[11]

A.

The Establishment Clause of the First Amendment states, "Congress shall make no law respecting an establishment of religion . . . ." U.S. Const. amend I. This restriction has been made applicable to states, as well as state-created entities and their employees, through the Due Process Clause of the Fourteenth Amendment. Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S. Ct. 900, 903, 84 L. Ed. 1213 (1940). The Establishment Clause applies not only to state statutes, but acts and decisions of individual governmental actors, such as teachers and school administrators. Lee v. Weisman, 505 U.S. 577, 587, 112 S. Ct. 2649, 2655, 120 L. Ed. 2d 467 (1992).

In Lemon v. Kurtzman, 403 U.S. 602, 91 S. Ct. 2105, 29 L. Ed. 2d 745 (1971), the Supreme Court set forth its famous three-prong test for assessing the

---

[11] We also note that, even putting aside questions of qualified immunity, the district court's legal conclusion—that Holloman's rights under the Establishment Clause had not been violated—would have required that the court dismiss his § 1983 claims under the Establishment Clause for failure to state a claim. Given that the issue has been thoroughly briefed and argued by both sides before us, we need not wait for a subsequent appeal from this legally inevitable ruling to consider this matter.

permissibility of statutes under the Establishment Clause. "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion." Id. at 612-13, 91 S. Ct. at 2111 (internal citations and quotations omitted). Agostini v. Felton, 521 U.S. 203, 233, 117 S. Ct. 1997, 2015, 138 L. Ed. 2d 391 (1997), however, refined this test, stating, "[T]he factors we use to assess whether an entanglement is 'excessive' are similar to the factors we use to examine 'effect.' . . . [I]t is simplest to recognize why entanglement is significant and treat it . . . as an aspect of the inquiry into a statute's effect." Thus, while the Court has folded its traditional "excessive entanglement" inquiry into its "primary effect" analysis, the substance of its Establishment Clause jurisprudence remains fundamentally unaltered. See, e.g., Zelman v. Simmons-Harris, 536 U.S. 639, 648-49, 122 S. Ct. 2460, 2465, 153 L. Ed. 2d 604 (2002). This Section demonstrates that Allred's practice of soliciting prayer requests from her students and enforcing a moment of silence runs afoul of the Lemon-Agostini standard. Subsection (a) looks to the purpose of her acts, while Subsection (b) examines their primary effect.

1.

66

A government official violates the Establishment Clause if she lacks a "secular legislative purpose" for her actions. Comm. for Pub. Educ. & Religious Liberty v. Regan, 444 U.S. 646, 652, 100 S. Ct. 840, 846, 63 L. Ed. 2d 94 (1980). Allred attempts to defend her daily moment of silent prayer by arguing that it was intended to teach students compassion,[12] pursuant to the character education plan mandated by the State Legislature. See supra Section I.C; see also Ala. Code § 16-6B-2.

This explanation does not constitute a valid secular legislative purpose for Allred's actions. First, Allred's most basic intent unquestionably was to offer her students an opportunity to pray in a public school during the school day, and effectively encourage them to do so. By collecting prayer requests, and using the phrases "let us pray" and "amen," she gave the practice of praying during the moment of silence her implicit imprimatur.

While she may also have had a higher-order ultimate goal of promoting compassion, we look not only to the ultimate goal or objective of the behavior, but also the more immediate, tangible, or lower-order consequences a government

---

[12] Compassion was not the only character trait Allred attempted to instill in her students. She testified, "If you are talking about cleanliness, we talk about litter. You know, and I have discussed that with students, being fined if you throw out litter. Cleanliness as far as personal hygiene, I have actually mentioned that when I had a problem in class. You know, 'Everybody don't forget to, you know, bathe.'"

actor intends to bring about. Allred's mere "testimonial avowal of secular . . .

purpose is not sufficient to avoid conflict with the Establishment Clause." Karen

B. v. Treen, 653 F.2d 897, 900 (11th Cir. 1981).

This reasoning closely follows that employed by the Supreme Court in

Stone v. Graham, wherein it held that, notwithstanding supposedly secular

justifications offered by the school district, "[t]he pre-eminent purpose for posting

the Ten Commandments on schoolroom walls is plainly religious in nature. The

Ten Commandments are undeniably a sacred text in the Jewish and Christian

faiths, and no legislative recitation of a supposedly secular purpose can blind us to

that fact." 449 U.S. 39, 41, 101 S. Ct. 192, 194, 66 L. Ed. 2d 199 (1980). Because

prayer is "a primary religious activity in itself," see Treen, 653 F.2d at 901, a

teacher or administrator's intent to facilitate or encourage prayer in a public school

is per se an unconstitutional intent to further a religious goal.

Second, even accepting Allred's testimony that she hoped to use prayer as a

way of teaching compassion, our analysis does not end there. While promoting

compassion may be a valid secular purpose, teaching students that praying is

necessary or helpful to promoting compassion is not.[13] As we held in Treen,

---

[13] It is instructive, though by no means necessary to our holding, that Allred also considered readings from the Bible to be part of her students' character education.

> Even if the avowed objective of the legislature and school board is not itself strictly religious, it is sought to be achieved through the observance of an intrinsically religious practice. The unmistakable message of the Supreme Court's teachings is that the state cannot employ a religious means to serve otherwise legitimate secular interests.

Id. at 901.

The Supreme Court was faced with similar facts in School District v. Schempp, 374 U.S. 203, 83 S. Ct. 1560, 10 L. Ed. 2d 844 (1963), wherein it refused to conclude that daily readings from the Bible in public schools had a valid secular purpose. The State argued that the purposes of the statute requiring the Bible readings were "the promotion of moral values, the contradiction to the materialistic trends of our times, the perpetuation of our institutions and the teaching of literature." Id. at 223, 83 S. Ct. at 1572. The Court struck down the statute, asserting that "even if its purpose is not strictly religious, [its purpose] is sought to be accomplished through readings, without comment, from the Bible. Surely the place of the Bible as an instrument of religion cannot be gainsaid . . . ." Id. at 224, 83 S. Ct. at 1572. Elsewhere, this court has emphasized, "Recognizing that prayer is the quintessential religious practice implies that no secular purpose can be satisfied. . . ." Jaffree v. Wallace, 705 F.2d 1526, 1534-35 (11th Cir. 1983)

[Jaffree I], aff'd sub nom. Wallace v. Jaffree, 472 U.S. 38, 105 S. Ct. 2479, 86 L. Ed. 2d 29 (1985) [Jaffree II].

Under these precedents, a person attempting to further an ostensibly secular purpose through avowedly religious means is considered to have a constitutionally impermissible purpose. See Jager v. Douglas Cty. Sch. Dist., 862 F.2d 824, 830 (11th Cir. 1989) ("[A]n intrinsically religious practice cannot meet the secular purpose prong of the Lemon test . . . ."). The point of Allred's daily "ritual" was to show that praying is a compassionate act; such an endorsement of an intrinsically religious activity is inconsistent with the Establishment Clause. For these reasons, we find that Allred violated the Establishment Clause because her acts were motivated, at least in part, by a desire to inculcate "religiosity."

2.

Allred's behavior also fails the "effects" prong of the Lemon-Agostini test because the effect of her behavior was clearly to promote praying, a religious activity. Praying is perhaps the "quintessential religious practice," see Treen, 653 F.2d at 901, and to explicitly call for prayer requests, invoke a moment of silence for prayer with the phrase "let us pray," actually hold such a moment of silence,

and sometimes conclude with "Amen" has the effect of both endorsing religious activity, as well as encouraging or facilitating its practice. ____

This behavior is clearly the type of "invocation of God's blessings" of which the Supreme Court disapproved in Engel v. Vitale, 370 U.S. 421, 422, 82 S. Ct. 1261, 1262, 8 L. Ed. 2d 601 (1962). Allred's use of the concept of silent prayer could quite reasonably appear to be an "endorsement [of religion that] is not consistent with the established principle that the government must pursue a course of complete neutrality toward religion." Jaffree II, 472 U.S. at 60, 105 S. Ct. at 2491 (holding that a statute allowing public school teachers to expressly dedicate a moment of silence to prayer violates the Establishment Clause); see also Schempp, 374 U.S. at 225, 83 S. Ct. at 1573 ("[T]he Government [must] maintain strict neutrality, neither aiding nor opposing religion."). While Allred did not promote any particular prayer, or even compel prayer in general, her policy undeniably "encourage[d] recitation of . . . prayer." Engle, 370 U.S. at 424, 82 S. Ct. at 1263. Consequently, we conclude that Allred's acts violated the Establishment Clause.

Allred argues that her behavior does not have the effect of furthering religion because her students frequently asked her to hold the moments of silence. We held in Chandler v. Siegelman, "So long as the prayer is genuinely student-

initiated, and not the product of any school policy which actively or surreptitiously encourages it, the speech is private and it is protected." 230 F.3d 1313, 1317 (11th Cir. 2000) (Chandler II). Allred takes an exceedingly broad view of the phrase "student-initiated," interpreting it to be woefully inconsistent with the rest of our opinion in that case.

Under Chandler II, read as a whole, a prayer is not "student-initiated," and hence constitutional, simply because the initial idea for the prayer was a student's. For example, the fact that a student may come up with the idea of having the Lord's Prayer recited over his school's loudspeakers each day does not mean the prayer is "student initiated," and so constitutional, under Chandler II. Indeed, in the Supreme Court's Santa Fe ruling (which Chandler II applied), the student body had conducted an election and affirmatively voted to have prayers recited at football games, but the Court nevertheless invalidated the practice. School personnel may not facilitate prayer simply because a student requests or leads it.

The true test of constitutionality is whether the school encouraged, facilitated, or in any way conducted the prayer. Chandler II used the phrase "student-initiated" to mean "independently student organized and conducted," as opposed to "school sponsored" or "school conducted." In fact, in the actual holding of the case, we upheld a portion of an injunction enjoining the school

72

district from "'aiding, abetting, commanding, counseling, inducing, ordering, or procuring' school organized or officially sanctioned religious activity." Id. at 1317. While purely private prayer by students is constitutionally protected, prayer that is led, encouraged, or facilitated by school personnel is constitutionally prohibited. "[E]ven genuinely student-initiated speech may constitute state action if the State participates in or supervises the speech. . . . [S]tudent religious speech must be without oversight, without supervision, subject only to the same reasonable time, place, and manner restrictions as all other student speech in school." Chandler v. James [Chandler I], 180 F.3d 1254, 1264-65 (11th Cir. 1999). In this case, the prayer requests and moments of silence for prayer cannot be considered purely student speech because they were coordinated and conducted by a teacher (in a classroom during school hours, no less).

That students were not actually forced to pray during the moment of silence, and may have been free to leave the room, does not alleviate the constitutional infirmities of Allred's moment of silence. The Engel Court declared, "[T]he fact that the program . . . does not require all pupils to recite the prayer but permits those who wish to do so to remain silent or be excused from the room, ignores the essential nature of the program's constitutional defects." 370 U.S. at 430, 82 S. Ct. at 1266. The Court further explained, "The Establishment Clause, unlike the

73

Free Exercise Clause, does not depend upon any showing of direct governmental compulsion and is violated by the enactment of laws which establish an official religion whether those laws operate directly to coerce nonobserving individuals or not." Id., 82 S. Ct. at 1267. The Schempp Court later reaffirmed that the unconstitutionality of school-sponsored prayer is not "mitigated by the fact that individual students may absent themselves upon parental request, for that fact furnishes no defense to a claim of unconstitutionality under the Establishment Clause." Schempp, 374 U.S. at 223, 83 S. Ct. at 1572.

The "nondenominational" nature of the moment of silence is similarly of no avail. Weisman, 505 U.S. at 594, 112 S. Ct. at 2659 (stating that the nonsectarian nature of a school-sponsored prayer "does not lessen the offense or isolation to the objectors. At best it narrows their number, at worst increases their sense of isolation and affront."). "[G]overnment is required to be a neutral among religions and between religion and nonreligion." Mitchell v. Helms, 530 U.S. 793, 878, 120 S. Ct. 2530, 2578, 147 L. Ed. 2d 660 (2000) (emphasis added) (quotation and citation omitted). "It is now firmly established that a law may be one 'respecting an establishment of religion' even though its consequence is not to promote a 'state religion' and even though it does not aid one religion more than another but merely benefits all religions alike." Comm. for Pub. Educ. v. Nyquist, 413 U.S.

74

756, 771, 93 S. Ct. 2955, 2964-65, 37 L. Ed. 2d 948 (1973). Encouraging or facilitating any prayer clearly fosters and endorses religion over nonreligion, and so runs afoul of the First Amendment.

The brevity of Allred's moment of silent prayer does not alleviate her constitutional violation, either. It is "no defense to urge that the religious practices here may be relatively minor encroachments on the First Amendment." Schempp, 374 U.S. at 225, 83 S. Ct. at 1573. Our own precedents clearly state that "[t]he Establishment Clause does not focus on the amount of time an activity takes, but rather examines the religious character of the activity." Jager, 862 F.2d at 832.

It is instructive to compare the case before us with another moment-of-silence case in which we found that the Establishment Clause was not violated. In Bown v. Gwinett County School District, 112 F.3d 1464 (11th Cir. 1997), we held that a Georgia statute requiring public school teachers to observe a moment of silence each day in their classrooms did not violate the Lemon test. The statute had a secular purpose because it expressly declared that the "moment of quiet reflection . . . is not intended to be and shall not be conducted as a religious service or exercise but shall be conducted as an opportunity for a moment of silent reflection on the anticipated activities of the day." Id. at 1469 (quoting O.C.G.A. § 20-2-1050(b)). Moreover, the statute's sponsor stated that he "viewed the Act

not as providing for school prayer, but rather as providing for a moment for students to collect their thoughts, focus on the upcoming day, and begin to develop self-respect and discipline." Id. at 1471.

Because the statute, as actually implemented, did not have the effect of promoting or inhibiting religion, it also satisfied the second prong of the Lemon test. The announcement made over the school loudspeaker that commenced the moment of silence each day "indicated only that there would be a moment of silence to reflect on the day's activities. . . . [and] in no way suggested that students should or should not pray silently during the moment of quiet reflection . . . ." Id. at 1472. Moreover, "[t]he Administrative Bulletin circulated to all school principals instructed that teachers should not suggest that students use the moment of quiet reflection for prayer," and we found no indication "that any teacher encouraged prayer in violation of the guidelines stated in the Administrative Bulletin." Id.

The instant case is easily distinguishable from Bown in that Allred, far from taking steps to ensure that her moment of silence was not regarded as a religious activity, affirmatively and repeatedly labeled it as such. Her characterization of the moment of silence is important; in Adler v. Duval Cty. Sch. Bd., 250 F.3d 1330, 1342 (11th Cir. 2001), we upheld a school's policy of having student

graduation speakers in part because of "the complete absence . . . of code words such as 'invocation' unequivocally connoting religion." The district court in this case was willing to overlook the fact that Allred would frequently "'slip[] up' by using the word 'pray' instead of the words 'moment of silence,' . . . and by indicating the end of the moment of silence by voicing the word 'amen', a poor substitute, perhaps, for the words 'let's get to work.'" (Mem. Op. June 4, 2001, at 6). Such labels, however, are quite important in determining not only the purpose behind the actions at issue (discussed in the prior Subsection), but also their nature, likely effects, and the degree to which they are likely to be perceived as state endorsement, facilitation, or promotion of religion.

For these reasons, we have no trouble in concluding that these facts amount to blatant and repeated violations of the Establishment Clause.

## B.

Having established that Allred infringed Holloman's rights under the Establishment Clause, we now must assess whether these rights were "clearly established" at the time of her actions. The district court held, without explanation, that "[n]o jury could reasonably conclude that 'every like-situated, reasonable' teacher or principal would necessarily know . . . that using the word

'prayer' as a euphemism for 'moment of silence,' violated freedom of religion or freedom from religion." (Mem. Op., June 4, 2001, at 10). We are again forced to disagree.

By now it should go without saying that it is unconstitutional for a teacher or administrator (or someone acting at their behest) to lead students aloud in voluntary prayer. See Engel, 370 U.S. at 422, 82 S. Ct. at 1262 (prohibiting recitation of nondenominational prayer); Schempp, 374 U.S. at 216, 83 S. Ct. at 1568 (invalidating school board practice of reciting the Lord's Prayer over the school loudspeakers each day).

In Jaffree II, another case from Alabama involving unconstitutional Establishment Clause practices, the Supreme Court went a step further and condemned the use of a moment of silence when one of the purposes for which it was expressly instituted was prayer. 472 U.S. 38, 105 S. Ct. 2479. The Alabama state legislature had enacted a statute, Ala. Code § 16-1-20, requiring that public school teachers in the first through sixth grades establish a daily moment of silence "for meditation." Id. at 40, 105 S. Ct. at 2481. Three years later, it enacted § 16-1-20.1, which permitted (though not required) all public school teachers to hold a moment of silence "for meditation or voluntary prayer." The parties agreed that the original statute, providing only for a moment of silence for meditation,

was constitutionally permissible. The Court held that the later enactment, which expressly specified "voluntary prayer" as an additional purpose for, or permissible activity to perform during, the moment of silence, was unconstitutional. It found that the enactment of § 16-1-20.1 "was not motivated by any clearly secular purpose–indeed, the statute had no secular purpose." Id. at 56, 105 S. Ct. at 2489-90. It further noted that, notwithstanding the general permissibility of a moment of silence, expressly designating it as an opportunity for prayer "convey[s] a message of state endorsement and promotion of prayer." Id. at 59, 105 S. Ct. at 2491. The Court concluded, "Such an endorsement is not consistent with the established principle that the government must pursue a course of complete neutrality toward religion." Id. at 60, 105 S. Ct. at 2491.

We see no way of distinguishing Jaffree II from the instant case. If a law that allowed teachers to institute a moment of silence expressly for prayer is unconstitutional, then it surely also unconstitutional for a teacher to actually institute a moment of silence expressly for prayer. The law cannot get much more "clearly established" than that.

Having concluded that Holloman successfully alleged a violation of the Establishment Clause, we now turn to the viability of both his Speech and Establishment Clause claims against the School Board.

V.

The School Board may not be held liable for the unconstitutional acts of its employees under a respondeat superior theory. In cases such as Monell v. Department of Social Services, 436 U.S. 658, 690-91, 98 S. Ct. 2018, 2035-36, 56 L. Ed. 2d 611 (1978), the Supreme Court articulated the circumstances in which "local governing bodies" are subject to § 1983 liability. This Part examines each of the ways in which Holloman contends that the School Board may be sued.

A.

Monell states that "when execution of a government's policy . . . inflicts the injury . . . [then] the government as an entity is responsible under § 1983." Id. at 694, 98 S. Ct. at 2037-38. To hold the School Board liable for Holloman's Speech Clause claim under this theory, we must locate some affirmative official policy that a reasonable jury could understand as calling upon teachers to compel students to salute the flag. Ala. Code § 16-43-5 provides, "The State Board of Education shall afford all students attending public kindergarten, primary and

80

secondary schools the <u>opportunity</u> each school day to <u>voluntarily</u> recite the pledge

of allegiance to the United States flag." (emphasis added). State law clearly does

not allow students to be forced to salute the flag. The Superintendent of the

Walker County Public School System issued a memorandum on the Board of

Education's letterhead, stating, "[E]ach school system must incorporate a

Character Education Plan which will consist of ten minutes of instruction per day

in various areas, such as, the Pledge of Allegiance . . . . Each day must include the

Pledge of Allegiance, and then other areas mentioned as you determine at your

school." This official policy directive lacks the language of voluntariness found in

the statute. It also mandates that each day <u>include</u> the pledge, rather than include

<u>the opportunity</u> to recite the pledge. A reasonable jury could conclude that this

memorandum required teachers to ensure that their students actually recited the

pledge.[14] Consequently, the Board may be held liabel for Holloman's compelled-

speech First Amendment claim

    To hold the Board liable under the Establishment Clause claim for Allred's

daily moment of silent prayer under an "official policy" theory, we must find a

_____

[14] In his deposition, Harland briefly discussed the memo. He testified, "We [have] a memo from when Mr. Larry Banks was the superintendent. I think the Pledge of Allegiance was spelled out as being one of the things that took place in the morning. . . . [The] Pledge of Allegiance was part of the character education, and the teachers did various things in there to teach character and promote good citizenship, but the pledge was part of it."

policy mandating, authorizing, or permitting teachers to take prayer requests or hold moments of silence for prayer. The only testimony in the record concerning whether or not these prayers were conducted pursuant to School Board policy came from Allred. She testified during her deposition that her practice of asking for prayer requests was "actually included in compassion in the character education plan. For me to refuse students to express compassion for someone else would be contrary to our character education plan that we implement through our curriculum." Based on the uncontroverted testimony from the teacher charged with implementing School Board policies (including the character education plan the Board required schools in the district to implement) that her unconstitutional acts were required by a Board policy, we cannot help but conclude that Holloman has introduced sufficient evidence to show that the Board can be held liable because Allred was acting pursuant to a Board policy.

In further support of this theory, we also note that each high school's character education plan had to be approved by the School District before being forwarded onto the State Department of Education. For reasons that are unclear to us, it appears that neither party actually entered Parrish High School's character education plan into the record. Consequently, we can only attempt to determine what inferences a reasonable jury could make. We know that the plan had to be

approved by the School Board, and that Allred claims that her daily prayer ritual was part of it. It is also noteworthy that Vice Principal Adkins was aware of Allred's practice, having experienced it firsthand during his visit to her classroom; based on his lack of surprise or disapproval, a jury could infer that Adkins knew that prayer was part of Allred's contribution to the character development plan. Interpreting these facts in the light most favorable to Holloman, a reasonable jury could draw the inference that prayer was included in the written plan approved by the School Board, forming another, more direct way in which the Board may be held liable as having promulgated an unconstitutional policy.[15]

## B.

A municipal governing body may be held liable for acts or policies of individuals to whom it delegated final decisionmaking authority in a particular area. Matthews v. Columbia Cty., 294 F.3d 1294, 1297 (11th Cir. 2002) ("Local government liability can exist when someone with final policymaking authority delegates that authority to someone else. But, the delegation must be such that the

---

[15] Earlier, we held that (based on the facts before us interpreted in the light most favorable to the plaintiff) Allred had failed to establish as a matter of law that she was engaged in a discretionary function of her job when she held her daily moment of silent prayer. If a jury were to make this determination based on the evidence at trial, it would be impossible for the jury to likewise conclude that she was acting pursuant to an official board policy. Even under those circumstances, however, the Board could still be held liable under any of the other theories discussed in this Part.

decision is not subject to review by the policymaking authority."); Gattis v. Brice, 136 F.3d 724, 725 (11th Cir. 1998) ("If a county official holds final policymaking authority for the county in the subject area of the alleged constitutional violation, that official's decisions may constitute county policy.").  A member or employee of a governing body is a final policy maker only if his decisions have legal effect without further action by the governing body, see Matthews, 294 F.3d at 1297 ("[E]ven if [member of governing entity] was given the power to select which positions would be eliminated  . . . his selections still had to be accepted by a majority of the board.  As such, [that member] never possessed final policymaking power himself . . . ."), and if the governing body lacks the power to reverse the member or employee's decision, see Quinn v. Monroe Cty., 330 F.3d 1320, 1326 (11th Cir. 2003) ("Because the [governmental entity] has the power to reverse any termination decision made by [individual government official], he is not a final policymaker with regard to termination decisions at the library.").  To determine if someone is a final policy maker, we look not only to "state and local positive law," but also "custom and usage having the force of law."  McMillian v. Johnson, 88 F.3d 1573, 1577 (11th Cir. 1996); see also Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 109 S. Ct. 2702, 2723, 105 L. Ed. 2d 598 (1989) (holding that an individual can be a "final policymaker" either by operation of "state and local

84

positive law" or by "custom or usage having the force of law"). We review <u>de novo</u> a district court's ruling about whether an individual is a final policy maker. <u>Scala v. City of Winter Park</u>, 116 F.3d 1396, 1401 (11th Cir. 1997).

In <u>Denno v. School Bd.</u>, 218 F.3d 1267, 1277 (11th Cir. 2000), we held that the existence of a three-step process allowing parents to appeal a principal's decision to an area assistant superintendent and ultimately to the School Board was sufficient to strip the principal of final policymaking authority. While the principal's decisions clearly had immediate legal effect, the fact that at least two other entities could reverse those decisions was inconsistent with the notion that the principal was a final decision maker.

The School Board would have us rest this case on <u>Denno</u> because the Parrish High School student handbook specifies that students have "the right and the responsibility to express school-related concerns and grievances to the teachers and school administrator(s). . . . [I]n the event that the grievance cannot be settled by this procedure, then the student . . . may pursue the grievance to the Superintendent of Schools and then to the Board." In <u>Denno</u>, however, the student was suspended, and we found that, under the circumstances, the policies outlined in the student handbook "allowed for meaningful review of Denno's suspension." <u>Denno</u>, 218 F.3d at 1277.

Our ruling in <u>Denno</u> was based on a theme reiterated through much of our caselaw—in assessing whether a governmental decision maker is a final policy maker, we look to whether there is an actual "opportunity" for "meaningful" review.  See <u>Oladeinde v. City of Birmingham</u>, 230 F.3d 1275, 1295 (11th Cir. 2000) (emphasizing that there must be an actual "opportunity" for "meaningful administrative review" before we conclude that a governmental decision maker lacks final policymaking authority); <u>Scala</u>, 116 F.3d at 1401 ("Final policymaking authority over a particular subject area does not vest in an official whose decisions in the area are subject to <u>meaningful</u> administrative review.") (emphasis added); see also <u>Grech v. Clayton Cty.</u>, 335 F.3d 1326, 1351 (11th Cir. 2003) (Barkett, J., concurring) ("An official must have discretion in a particular area of law in order to exercise final policymaking authority in that area and may not be subject to <u>significant</u> review.") (emphasis added); <u>Bowen v. Watkins</u>, 669 F.2d 979 (5th Cir. 1982) ("If a higher official has the power to overrule a decision but as a practical matter never does so, the decision maker may represent the effective final authority on the question.").

In the instant case, there was no opportunity for meaningful review by the School Board.  While the student handbook set out an formal multi-step appellate process that was theoretically available on paper, Holloman could not, as a

practical matter, take advantage of it. Graduation was barely a few days away, and Harland did not offer to "stay" Holloman's punishment while he sought Board review. Indeed, the record is silent as to whether there would even be an intervening meeting of the Board or other opportunity to invoke its oversight. Even if the School Board were to engage in an ex post review of the punishment, the fact remains that the paddling could not be undone. Due to the impending end of the school year, the punishment—unlike the suspension in Denno—could not be postponed to potentially allow for Board review; Harland had made it clear that if Holloman did not submit to punishment, he would not receive his diploma on graduation day. Cf. Weisman, 505 U.S. at 595, 112 S. Ct. at 2659 ("Everyone knows that in our society and in our culture high school graduation is one of life's most significant occasions.").

Needless to say, our holding that Harland acted as a final decision maker in this context does not mean that he always acts as such. As we noted in McMillian, "[a]n official or entity may be a final policymaker with respect to some actions but not others." 88 F.3d at 1578. On other occasions, where there is a meaningful opportunity for substantive Board review, or where a punishment is not a fait accompli or otherwise irreversible, the "appellate" procedures outlined in the

student handbook may be pursued, and Harland would act as merely the initial—rather than final—policy maker.

We could also interpret the "Corporal Punishment" section of the student handbook as a delegation to Harland of final decisionmaking authority regarding the administration of corporal punishment. It reads:

> In order to establish and maintain an educational climate conducive to learning, the Board permits reasonable corporal punishment of students in the schools of the School District. If such punishment is required, it shall be administered with care, tact, and caution by the principal or his/her designee in accordance with Board policies.

Vice Principal Adkins testified in his deposition that there were no other Board policies regarding corporal punishment.

A student's pain and humiliation from this act of physical violence cannot be undone; Holloman cannot be un-spanked. In the absence of any meaningful Board oversight mechanism prior to the administration of corporal punishment, we cannot help but conclude that Harland had been delegated final policymaking authority in determining when to spank a student. In granting him this power without integrating itself into the pre-spanking review process, the Board necessarily bound itself to his decisions. Thus, the School Board's delegation of effectively unreviewable corporal punishment authority constitutes a related yet alternate basis upon which we find that Harland was a final decision maker.

88

Consequently, depending on how the facts ultimately develop at trial, the Board may be held liable under the First Amendment for either his decision to punish Holloman for engaging in constitutionally protected expression, or to punish Holloman for engaging in unprotected expression on impermissible viewpoint-based grounds.

Regarding the Establishment Clause issue, we find that Allred was not a final policy maker. The prayers were recited as part of the character education program, which as discussed earlier was expressly subject to School Board approval. Consequently, Allred could not have been the final policy maker in this area, and Holloman's Establishment Clause claims against the School Board cannot be supported on this basis.

C.

The Supreme Court has recognized that municipal governing entities may be held liable for unconstitutional acts of employees that occur pursuant to a municipal "custom." See Monell, 436 U.S. at 690-91, 98 S. Ct. at 2036. We are unable to conclude, based on the incidents involving Holloman and Hutto, that a "custom" or "practice" of disciplining students for failing to recite the Pledge of Allegiance (or for engaging in a non-disruptive protest during the pledge) existed

in the school district.  Consequently, Holloman may not pursue his Speech Clause claim against the Board under this theory.

In contrast, Allred's practice of conducting a daily moment for silent prayer—which she actually referred to as a "ritual"—was sufficiently systematic to be considered a pattern or custom for which the Board may be held accountable. Our precedents are clear that, for constitutional violations to be sufficiently "widespread" for a governmental supervisor to be held liable, they need occur with frequency, see Brown, 906 F.2d at 671 (holding that violations must be "obvious, flagrant, rampant, and of continued duration" to hold a supervisor liable); see also Greason v. Kemp, 891 F.2d 829, 837 (11th Cir. 1990) (noting that the "situation of municipal liability" is "analogous" to the question of supervisoral liability), and need not necessarily be committed by several people within a department or agency.  When rights are systematically violated on a near-daily basis, such abuses are sufficiently egregious to warrant supervisory liability, even if it is a single "bad apple" engaging in the repeated pattern of unconstitutional behavior.  See St. Louis v. Praprotnik, 485 U.S. 112, 130, 108 S. Ct. 915, 928, 99 L. Ed. 2d 107 (1988) (noting that vicarious liability under § 1983 is appropriate"if a series of decisions by a subordinate official [singular] manifested a 'custom or usage' of which the supervisor must have been aware") (emphasis added).  Consequently,

90

based on the systematic frequency of these violations, a jury could conclude that the Board knew of the practice yet nevertheless permitted it to fester unabated.

## VI.

Allred is not entitled to summary judgment on qualified immunity grounds against Holloman's Speech Clause claim to be free from compelled speech, his Speech Clause claim to affirmative freedom of expression, his Speech Clause claim to be free of viewpoint discrimination, or his Establishment Clause claim.

Harland is not entitled to summary judgment on qualified immunity grounds against Holloman's Speech Clause claim to be free from compelled speech, his Speech Clause claim to affirmative freedom of expression, or his Speech Clause claim to be free from viewpoint discrimination. We do not consider the question of Harland's entitlement to summary judgment against Holloman's Establishment Clause claim because Holloman abandoned this issue on appeal.

Holloman has successfully articulated claims against the School Board for violations of his Speech Clause right to be free from compelled speech (under an "official policy" theory), his Speech Clause right to engage in affirmative expression (under a "delegation to a final policymaker" theory), his Speech Clause claim to be free from viewpoint discrimination (also under a "delegation to a final

policymaker" theory), and his Establishment Clause rights (under either an "official policy" or a "custom" theory). We reverse the district court's grant of summary judgment, and reinstate Holloman's claims against the Board.

REVERSED AND REMANDED.

WILSON, Circuit Judge, concurring in part and dissenting in part:

I join Parts I, II-A, and II-B of the majority's opinion, which hold that there is an issue of material fact as to whether Holloman was punished for failing to say the Pledge of Allegiance ("the Pledge"), which if true, would violate Holloman's clearly established constitutional right not to say the Pledge. However, I respectfully dissent from Part II-C. In Part II-C, the majority holds that even if Holloman was in fact punished for raising his fist in the air during the recitation of the Pledge rather than for merely failing to say the Pledge, then there is an issue of material fact as to whether his First Amendment right was violated. In addition, the majority holds that such a First Amendment right is clearly established in our case law. I disagree. I contend, rather, that Holloman does not have a First Amendment right to raise his clenched fist in the air during the school's recitation of the Pledge any more than he would have a First Amendment right to raise his fist in the air during math class. Such an act is inherently disruptive, and a teacher has every right to prevent such conduct in his or her classroom in order to prevent any potential disruption.[1] I also believe that even if Holloman had a First Amendment right to raise his fist in the air during the recitation of the Pledge, such a right certainly was not clearly established in our case law.

---

[1] We are not called upon to decide the propriety of the type of punishment inflicted here.

I agree with the majority's conclusion, though, with respect to Part II-D of its opinion. While Holloman's expression was not constitutionally protected in the classroom because it is inherently disruptive, he still has a clearly established First Amendment right to not be discriminated against on the basis of the viewpoint he is communicating. *See Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 812 ("While we accept the validity and reasonableness of the justifications offered by petitioner for excluding [the relevant speech], those justifications cannot save an exclusion that is in fact based on the desire to suppress a particular point of view."). There is a genuine issue of material fact as to whether Allred and Harland were motivated by a desire to suppress Holloman's apparent unpatriotic viewpoint, which if true, would violate Holloman's First Amendment right. Thus, I concur with the majority's conclusion with respect to Part II-D of its opinion.

In addition, I join Part IV of the majority's opinion, which holds that there is an issue of material fact as to whether Allred violated clearly established rights under the Establishment Clause by leading her class in a prayerful moment of silence. However, while I concur in the result of Part III (for the reasons stated in Part IV of the majority's opinion), I cannot join the majority's holding that Allred did not act within her "discretionary function" when she led the class in a moment

94

of silent prayer. I would hold, rather, that Allred acted within her discretionary function when leading her class in silent prayer, but that she violated the Establishment Clause by so doing.

Finally, I also join Part V of the majority's opinion only to the extent that it holds that there is an issue of material fact as to whether the School Board may be liable for punishing Holloman for remaining silent during the Pledge (if the factfinder finds that is the reason for his punishment) and for Allred's practice of leading the class in a prayerful moment of silence.

## I.

The majority not only holds that the evidence, reviewed in Holloman's favor, demonstrates that Holloman had a First Amendment right to raise his clenched fist in the air during the recitation of the Pledge in school, but also that such a right was clearly established. Because the majority's holding in this regard is neither consistent with Supreme Court precedent nor Eleventh Circuit case law, I respectfully dissent. I would hold that the First Amendment does not give a student in Holloman's circumstances the right to actively partake in conduct that is inherently disruptive during the curriculum portion of the school day. Yet, even if the First Amendment does grant such a right, that right certainly was not clearly established for qualified immunity purposes.

95

## A.

I agree with the majority that Holloman's act of raising his fist in the air during the Pledge is a form of expression, or indeed, may very well be "pure speech." It is an act that is, as the majority puts it, "purely communicative as a sign-language gesture or the act of holding up a sign . . . ." Majority Opinion at 30. I agree that Holloman's First Amendment right to Free Speech is implicated, but we must be mindful that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 682 (1986). "It is always within the province of school authorities to provide by regulation the prohibition and punishment of acts calculated to undermine the school routine." *Blackwell v. Issaquena County Bd. of Educ.*, 363 F.2d 749, 753 (5th Cir. 1966).[2] When balancing the First Amendment right of students at school, we must not forget that the state's interest to maintain "an orderly program of classroom learning" is a "compelling" one. *Burnside v. Byars*, 363 F.2d 744, 748 (5th Cir. 1966). Thus, public schools have a "wide latitude of discretion" to formulate regulations "pertaining to the discipline of school children." *Id.*

---

[2] In *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

96

Public schools are allowed "to adopt and enforce reasonable, non-discriminatory regulations as to the time, place and manner of student expressions and demonstrations." *Bayless v. Martine*, 430 F.2d 873, 878 (5th Cir. 1970). Such a regulation may infringe upon a student's right to free speech only "where the exercise of such rights in the school buildings and schoolrooms do[es] not materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Burnside*, 363 F.2d at 749. Keeping in mind that schools are given a "wide latitude of discretion," the critical issue in this case becomes whether Holloman's act of holding his clenched fist in the air during the recitation of the Pledge "materially and substantially interfere[d] with the requirements of appropriate discipline . . . ." *Id.* at 748, 749.

The majority cites several cases supporting its view that Holloman's act was not a sufficient interference to justify a punishment. Yet, some of these cases involve student expression occurring *outside* the classroom. *See, e.g., Shanley v. Northeast Indep. Sch. Dist.*, 462 F.2d 960, 964 (5th Cir. 1972) (involving the distribution of newspapers before and after school hours); *Reineke v. Cobb County Sch. Dist.*, 484 F. Supp. 1252 (N.D. Ga. 1980) (involving the censorship of a student newspaper). Certainly, the type and amount of expression occurring outside class that would "interfere with the requirements of appropriate

97

discipline," *Burnside*, 363 F.2d at 749, will be different than the type and amount of expression that interferes with appropriate discipline in the classroom. The school has a more compelling interest to establish order and discipline in the classroom because that is where the curriculum portion of the school day occurs.

In addition, those cases cited by the majority that protect student expression within the classroom are easily distinguishable from Holloman's expression. For instance, the majority relies on *Burnside*, which held that students wearing "freedom buttons" to class did not cause a sufficient interruption to justify prohibiting students from wearing the buttons at school. *Id.* We based our holding in *Burnside* on the lack of evidence demonstrating that "the buttons tended to *distract* the minds of the students away from their teachers." *Id.* at 748 (emphasis added). We held that "[w]earing buttons on collars or shirt fronts is certainly not in the class of those activities which *inherently distract* students and break down the regimentation of the classroom such as carrying banners, scattering leaflets, and speech making, all of which are protected methods of expressions, but all of which have no place in an orderly classroom." *Id.* (emphasis added). In addition, we said,

> Regulations which are essential in maintaining order and discipline
> on school property are reasonable. Thus school rules which assign
> students to a particular class, forbid unnecessary discussion in the

98

> classroom and prohibit the exchange of conversation between students are reasonable even though these regulations infringe on such basic rights as freedom of speech and association, because they are necessary for the orderly presentation of classroom activities.

*Id*. Our inquiry should focus upon, therefore, whether a student holding his fist in the air during a curriculum portion of the school day is more akin to a student "carrying banners" and "exchang[ing] conversation" during class, rather than wearing a button on the front of one's shirt. *Id.*

Activity that can be regulated by a public school, like "unnecessary discussion in the classroom," "the exchange of conversation between students," "carrying banners," "scattering leaflets," and "speech making," all have in common the fact that they inherently compete with the teacher for the other students' attention. Wearing a button on the front of one's shirt, though, does not compete with the teacher for the students' attention anymore than a student wearing a shirt advertising a particular sports team. Thus, we must determine whether a student raising his fist in the air during class inherently is the sort of activity that competes with the teacher for the students' attention, or whether it is a more passive expression like a wearing a shirt or a button conveying a particular message.

99

I think it is quite clear that a student raising his clenched fist in the air during a curriculum portion of the school day is the sort of activity that inherently competes with the teacher for the other students' attention and thus can be prohibited by the school authorities. Holloman's act of holding his fist in the air during the recitation of the Pledge is, as the majority says, akin to "the act of holding up a sign." Majority Opinion at 30. Such expression, unlike a button pinned to one's shirt, is meant to compete for students' attention, and thus *inherently* distracts students from a legitimate portion of the curriculum. Holding one's fist in the air is more like "carrying banners" which "inherently distract[s] students," *Burnside*, 363 F.2d at 748, than wearing a button on a shirt. Would a student have a right to hold up a sign during the recitation of the Pledge, as long as the student does not obstruct others' view of the flag? The answer to that question is plainly "no." Holding one's fist in the air is the same sort of communication as holding up a sign, as the majority even admits. It is meant to compete for students' attention and unnecessarily distract students from the recitation of the Pledge. It is not a passive expression, like wearing a button on the front of one's shirt. Like holding up a sign, it inherently is the sort of activity that distracts students during class. While a student may have more freedom to express himself outside of class, students in the classroom are limited to passive expressions that

100

do not inherently distract students.  A public school teacher is well within his or her authority to prohibit activity, like a student holding his fist in the air during class, that inherently distracts students.

Even if we were to assume, though, that a student holding his fist in the air during class is not activity that inherently distracts students, there is evidence on the record that Holloman in fact distracted students with his gesture, which would further distinguish the instant action from *Burnside*.  After Holloman's act of raising his fist during the Pledge, students approached their teacher to complain that Holloman's expression was not "right."  The majority reasons that this fact alone is not sufficient to show a material disruption.  While the majority is correct that schools cannot prohibit expression on the basis that others may disagree with the content of the expression, the students' comments not only demonstrate disagreement with the content of Holloman's expression, but also that Holloman's gesture "distract[ed] the[ir] minds" during a curriculum portion of the school day. *Id.*  The students' comments demonstrate that they at least focused their attention during a portion of the recitation of the Pledge on Holloman's fist – which

precisely is what is intended by such expression – rather than on the planned curriculum of saying the Pledge.[3]

If we do not interpret the students' comments as evidence of distraction, we necessitate absurd results in similar student expressions in the future. The majority's holding would imply, for example, that a student would be justified in holding up his fist in protest of the Vietnam conflict during a history lesson about Vietnam. Assume that the only evidence of disruption, like in the instant action, is that of students complaining that such a gesture during a class about the Vietnam conflict is not "right." Does such a circumstance necessarily indicate that the teacher does not have enough evidence of a disturbance to prohibit the student

---

[3] The majority claims that this approach "appears to ignore the principle . . . that student expression must cause (or be likely to cause) a 'material and substantial' disruption . . . before it may be curtailed." Majority Opinion at 34. I do not ignore this principle, but rather disagree with the majority by what we meant in *Burnside* when we said that public schools can only infringe on a student's speech when it "materially and substantially interfere[s] with the requirements of appropriate discipline in the operation of the school." *Burnside*, 363 F.2d at 749.

One of the "requirements of appropriate discipline" is preventing students from competing with the teacher or with the curriculum for other students' attention. For instance, we said in *Burnside* that a school may prohibit "the exchange of conversation between students" during class. *Id.* at 748. Thus, a teacher may prohibit and punish a student for whispering to his classmate during class, even if it causes a "brief, easily overlooked, *de minimum* impact." Majority Opinion at 34. One student whispering to another student during class competes with the teacher for the attention of other students, and thus "materially and substantially interfere[s]" with one of the fundamental "requirements of appropriate discipline." *Burnside*, 363 F.2d at 749.

Similarly, Holloman's act of raising his fist in the air during the Pledge competed for the students' attention during a legitimate curriculum portion of the school day. Indeed, some of the students' reaction after class indicated that he successfully distracted students from the recitation of the Pledge. Thus, Holloman's act "substantially and materially interfere[d] with the requirements of appropriate discipline" because it "tended to distract the minds of the students away from" the recitation Pledge. *Id.* at 749, 748.

from holding his clenched fist in the air during history class? It would be difficult to conclude otherwise following the reasoning of the majority's opinion. Such a conclusion, though, would plainly go well beyond what was intended by the First Amendment right to Free Speech as it applies to students in the classroom.

A public school is given "wide latitude" in disciplining its students. *Id.* The defendants in the instant case had every right to prevent Holloman from distracting the students during a legitimate, curriculum portion of the school day because a student holding his fist in the air is the sort of activity that "inherently distract[s] the minds of students," and that is exactly what Holloman did here. *Id.* In the very least, such activity is distinguishable from a student wearing a button on his shirt during class. The result in *Burnside* does not demand the same result here.

The majority also relies on *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969), which held that students had a constitutional right to wear a black arm band during class in protest of the Vietnam conflict. *Id.* at 514. The Court in *Tinker*, relying heavily on our reasoning in *Burnside*, said that wearing an arm band was not "disruptive action," nor was there any evidence of "interference, actual or nascent, with the school's work." *Id.* at 508.

The instant case is distinguishable from *Tinker* for the same reason it is distinguishable from *Burnside*. Wearing a button or an arm band is passive activity that does not inherently distract students during the curriculum portion of the school day, unlike raising one's fist in the air. Also, in *Tinker* there was no evidence of any interference or distraction during class. In the instant case, however, we have evidence of students, at the very least, being distracted for a portion of the Pledge due to Holloman's gesture. I fail to see how it follows that a right to wear a button or an arm band during class means that a student has a right to raise his fist during class. The result in *Tinker*, like *Burnside*, is inapposite to the instant action.

Finally, the district court relies on the reasoning and holding of *Banks v. Bd. of Pub. Instruction*, 314 F. Supp. 285 (S.D. Fla. 1970), *vacated by* 401 U.S. 988 (1971), *reinstated without published opinion by dist. ct. and aff'd*, 450 F.2d 1103 (5th Cir. 1971). In *Banks,* the Southern District of Florida held that a student has a constitutional right to remain seated during the recitation of the Pledge in class. The district court in *Banks*, according to the majority's interpretation, held that refusing to stand was a form of expression that was protected by the First Amendment, and that the "district court makes clear that its ruling was not based on Banks's First Amendment right to remain silent." Majority Opinion at 38. The

majority concludes that the expression of remaining seated during the Pledge is akin to Holloman's holding his fist in the air during the Pledge, and thus Holloman's expression is entitled to First Amendment protection.

In addition to the fact that a district court holding is not binding authority on this Court, it is not at all "clear that [the district court's] ruling was not based on Banks's First Amendment right to remain silent." Majority Opinion at 38. The court in *Banks* discussed extensively the reasoning of *West Virginia St. Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943), which held that a public school cannot compel a student to participate in the Pledge. After discussing *Barnette*, the district court in *Banks* said,

> Without more *Barnette* would be dispositive of this matter for [the plaintiff] was suspended for his refusal to act in accordance with a regulation, the operation of which prevented him from exercising his First Amendment rights.

*Banks*, 314 F. Supp. at 295. The court continued later in the opinion,

> Here, as in *Barnette*, the regulation required the individual to communicate, by standing, his acceptance of and respect for all that for which our flag is but a symbol.

*Id.* at 296. In other words, the district court's holding was based on the reasoning of *Barnette*. The school's policy of forcing a student to stand during the Pledge violated the student's First Amendment right *not* to be compelled to speak or

express a particular belief.  Any discussion by the district court in addition to this more limited holding is arguably dictum.

As the majority points out, the court in *Banks* also said that remaining seated during the Pledge "was no less a form of expression than the wearing of the black arm-band was to Mary Beth Tinker.  He was exercising a right 'akin to pure speech.'" *Id.* at 295.  I agree that a student may intend to express himself by remaining seated – yet I do not agree that it follows that the *Tinker-Burnside* standard applies to a student who merely remains seated during the Pledge. Remaining seated during the Pledge is a way for a student *not* to participate in the Pledge.  Thus, such a decision is afforded the more absolute protection of *Barnette*, in which the Supreme Court said,

> If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or *act* their faith therein.

*Barnette*, 319 U.S. at 642 (emphasis added).  Forcing a student to stand during the Pledge would be compelling that student to "confess by . . . *act* [his] faith" in the content of the Pledge and all that it symbolizes.  *Id.* (emphasis added).  Such a regulation would violate the central principle of *Barnette*.  *See Lipp v. Morris*, 579 F.2d 834, 836 (3rd Cir. 1978) (per curiam) (holding that forcing a student to stand

106

is unconstitutional because it requires a student "to engage in what amounts to implicit expression by standing at respectful attention while the flag salute is being administered").

While it is true that remaining seated during the Pledge may also be construed as a way of speaking, remaining seated is already in the class of those activities that are afforded the more absolute protections of *Barnette* – i.e., the right not to participate in the Pledge. To hold that the *Tinker-Burnside* standard applies to a student who remains seated during the Pledge would limit a student's right *not* to participate in the Pledge. If it can be shown that a student, or a group of students, who do not participate in the Pledge by remaining seated causes a material disruption, we would be forced to defer to the school's decision to *compel* students to stand during the Pledge. Such a ruling would allow a public official to "force citizens to confess by . . . act their faith" in the content of the Pledge and all it symbolizes. *Barnette*, 319 U.S. at 642. As a result, the "fixed star in our constitutional constellation" would become contingent upon the degree of disruption judges decide is too much in a particular classroom. Limiting the central right of being free to abstain from participating in the Pledge should not be limited by applying the *Tinker-Burnside* standard to a decision more absolutely protected by *Barnette*.

A student may decide not to participate in the recitation of the Pledge by remaining silent and seated. In such circumstances, the holding in *Barnette* applies. On the other hand, raising one's fist in the air during the Pledge is not a way in which a student abstains from participating in the Pledge. It can only be construed as expression. Thus, *Barnette* and *Banks* are not applicable to Holloman's act, but rather *Tinker* and *Burnside* apply. As I indicated above, I believe Holloman's act of raising his fist in the air during class is easily distinguished from the act of wearing a button or an arm band during class because raising one's fist in the air during the curriculum portion of the school day inherently distracts students, and thus materially disrupts the requirements of appropriate discipline.

Reciting the Pledge of Allegiance during the school day is a legitimate activity of the curriculum, just as legitimate as conducting math or history class. While a student is not required to participate in the Pledge, a student cannot engage in expressive conduct that inherently distracts the minds of the students from a legitimate portion of the school day. I would hold that there is no issue of material fact as to whether the school was justified in punishing Holloman, *if* that punishment was based on his act of raising his fist in the air during the recitation

108

of the Pledge of Allegiance and was not motivated by a desire to suppress

Holloman's point of view.

B.

Even if Holloman has a First Amendment right to hold his fist in the air

during the recitation of the Pledge in class, such a right was not "clearly

established." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818 (1982)). In order for a right to be clearly

established, the public official must be given "fair warning" that his or her conduct

violates a statutory or constitutional right. *See id.* at 741. Recently, the Supreme

Court in *Hope* held that we improperly used a "rigid gloss" when demanding that

the facts of previous cases be "materially similar" to the facts of the applicable

case in order for the law to be clearly established. *Id.* at 739. There are other

ways, though, besides comparing the facts of the instant case with the facts of

previous cases, to determine if a public official was given "fair warning" that a

certain act violated a statutory or constitutional provision. There are some cases in

which the law provides "obvious clarity," even in the absence of instances in

which courts have applied a general principle to particular facts. *See Vinyard v.*

*Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002). The majority holds that

Holloman's constitutional right to put his fist in the air during the recitation of the

Pledge is clearly established because the *Tinker-Burnside* standard was

"sufficiently specific" to give the defendants fair warning.  *See* Majority Opinion

at 50.  I respectfully disagree with both the majority's analysis and conclusion.

There are three ways in which we can find that the law is clearly established

so as to give public officials fair warning that a particular act violates a statutory

or constitutional right.  First, the words of a statute or constitutional provision can

be specific enough to clearly establish the law applicable to particular conduct and

circumstances, even in the absence of any case law.  *Vinyard*, 311 F.3d at 1350.

No one alleges that such a case is present here.  Second, sometimes "broad

statements of principle in case law [that] are not tied to particularized facts . . . can

clearly establish law applicable in the future to different sets of detailed facts."  *Id.*

at 1351.  The majority believes that such a case is present here, while I do not.  I

will address my disagreement below.  Finally, and this is true in the vast majority

of our qualified immunity cases, we inquire whether fact-specific precedents are

"fairly distinguishable" from the facts facing a government official.  *Id.* at 1352.  I

think this is the proper inquiry in the instant case.  Using this inquiry, I would

conclude that the precedent is fairly distinguishable from the circumstances in this

case, and thus the defendants were not given fair warning that disciplining a

student for raising his fist in the air during the Pledge was unconstitutional.

The majority considers whether the test, *by itself*, articulated in *Tinker* and *Burnside* clearly establishes that Holloman's act was constitutionally protected. The *Tinker-Burnside* test is whether the student expression "materially and substantially interfere[s] with the requirements of appropriate discipline in the operation of the school." *Burnside*, 363 F.2d at 749. The majority claims this test is "sufficiently specific" to give the defendants fair warning that Holloman's expression was constitutionally protected because it is reasonable "to expect the defendants – who hold themselves out as educators – to be able to apply such a standard, notwithstanding the lack of a case with material factual similarities." Majority Opinion at 50. In addition, the majority says applying this test would be "effortless," as "[a] teacher or principal should be able to instantly recognize whether a student is disrupting class, and it should not be too hard to determine whether a student's activities are likely to have such an effect." Majority Opinion at 51.

These reasons articulated by the majority are irrelevant to our analysis. The defendants thought that Holloman's act was *not* constitutionally protected – that is, they believed that his act "materially and substantially interfere[d] with the requirement of appropriate discipline." *Burnside*, 363 F.2d at 749. It simply does not follow that because it is "not too hard" for teachers to determine when a

111

student disrupts class, that it is then *obvious* to every reasonable teacher that a certain disruption will survive judicial scrutiny. In other words, teachers cannot be expected to readily determine what conduct falls within the Court's definition of "material and substantial interference with appropriate discipline." *Id.* Reasonable people certainly can disagree about how the Court will apply such a general standard, especially to the facts of the instant action. *See Vinyard*, 311 F.3d at 1351 ("[I]f a broad principle in case law is to establish clearly the law applicable to a specific set of facts facing a governmental official, it must do so 'with obvious clarity' to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.).

I do not think that the balancing test we use in our Free Speech cases established with "obvious clarity" that a student can raise his fist in the air during the curriculum portion of the school day. We define our broad standard of "materially and substantially interfer[ing] with the requirements of appropriate discipline" as including "those activities which inherently distract students" during class. *Burnside*, 363 F.2d at 749, 748. A reasonable teacher could conclude that a student raising his fist in the air during a curriculum portion of the school day is the sort of activity that "inherently distract[s] students." *Id.* at 748. Thus, the

defendants were not given fair warning by our case law that they were prohibited from punishing Holloman for his expressive act.

In the alternative, the majority states that Holloman's right to raise his fist in the air during the Pledge is clearly established under *Barnette*. In *Barnette*, the Supreme Court held that a public school cannot compel a student to participate in the Pledge. 319 U.S. at 642. The majority says that it is "very reluctant" to conclude that Holloman shed his First Amendment protection to remain silent during the Pledge by simply lifting his fist into the air. Majority Opinion at 52. "This is a hair we will not split," according to the majority because, I assume, "First Amendment protections are not lost that easily." Majority Opinion at 53.

Yet, this is precisely the "hair" the majority "split" earlier in its own opinion. For instance, the majority in Part II-B-1 persuasively establishes that there is an issue of material fact as to whether Holloman was punished for failing to say the Pledge or for raising his fist in the air. This was a proper distinction to make, because the answer to that question determines whether *Barnette* applies or whether *Burnside* and *Tinker* apply. *Barnette* prohibits a school from *compelling* a student to say the Pledge. *Burnside* and *Tinker* prohibits a school from preventing a student from *voluntarily* engaging in expression, as long as that expression does not sufficiently interfere with proper discipline in the classroom.

113

Holloman's act of raising his fist in the air, as the majority aptly pointed out, is what made his act *expression*, rather than just a failure to participate in the Pledge. In other words, Holloman's act of raising his fist is exactly what allows us to apply *Burnside* and *Tinker*. To conclude later, when considering whether *Barnette* clearly establishes Holloman's right to raise his fist, that it is no longer legally significant that Holloman raised his fist, is inconsistent.

*Barnette* holds that a student cannot be *compelled* to speak. *Barnette* says nothing about a student's *right* to speak. Holloman "spoke" by raising his fist. Thus, *Barnette* is not relevant to this inquiry.

For the reasons that I articulated above for why I believe Holloman's expression is distinguishable from the expression in *Tinker* and *Burnside*, I would hold that the law was not clearly established that Holloman had a right to raise his fist in the air during the recitation of the Pledge in class.

## II.

I agree with the majority's conclusion that Allred is not entitled to qualified immunity for leading the class in a moment of silent prayer. Such action, as aptly pointed out in Part IV of the majority's opinion, violates the Establishment Clause. *See Engel v. Vitale*, 370 U.S. 421 (1962). Thus, I join Part IV of the majority's opinion. However, the majority also held, in Part III, that Allred is not even

114

potentially entitled to summary judgment on qualified immunity grounds against Holloman's Establishment Clause claim because leading the class in a moment of prayerful silence is not within her "discretionary function." I think that such an interpretation stretches our inquiry of "discretionary function" beyond what is articulated in our case law. Thus, I would find that (1) Allred's act of leading her class in a prayerful moment of silence was within her discretionary authority, but (2) such an act was unconstitutional under the Supreme Court's interpretation of the Establishment Clause.

A government official acts within his discretionary authority when his actions "were undertaken pursuant to the performance of his duties and within the scope of his authority." *Sims v. Metro. Dade County*, 972 F.2d 1230, 1236 (11th Cir. 1992) (internal quotations omitted). We must keep in mind that our "inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act. Framed that way, the inquiry is no more than an untenable tautology." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998) (internal quotation omitted). Thus, just because a defendant's act may be unconstitutional does not mean that the act was not within the defendant's discretionary authority.

In the instant action, the Alabama state legislature enacted a statute requiring local school boards to "implement . . . a comprehensive character

education program . . . focusing upon the students' development of . . . compassion." ALA. CODE § 16-6B-2(h).  Allred claims she promoted compassion by asking the students for prayer requests before observing a moment of silence. While such an act would not pass muster under the Supreme Court's interpretation of the Establishment Clause, it is a legitimate way to promote compassion.  Asking students to offer prayers for other people may habituate students to think of others by praying for them.  Thus, I agree with the majority that Allred's act was pursuant to her job related goal of promoting compassion.

The majority believes, though, that while Allred's act of leading her class in a prayerful moment of silence was pursuant to a job related function, it was not within the scope of her authority.  The majority states that "[p]raying goes sufficiently beyond the range of activities normally performed by high school teachers," because "[p]rayer is a relatively *sui generis* activity."  Majority Opinion at 62.  Yet, the "*sui generis* activity" of praying in public schools *was* "normally performed" prior to the Supreme Court's decision in *Engel*.  Indeed, even today, many teachers in private high schools throughout America, whether they be religious or secular, lead their students in prayer.  Public school teachers no longer have the authority to lead their classes in prayer by virtue of the fact that the Supreme Court ruled it unconstitutional.  It was certainly within the scope of a

116

public high school teacher's authority to lead students in prayer prior to 1962, when the Court ruled that teacher led prayer in public schools is a violation of the Establishment Clause. The fact that a particular act may now be deemed unconstitutional does not mean that such an act is outside the scope of a public official's discretionary authority. *See Harbert*, 157 F.3d at 1282. There must be some other reason, besides the fact that a particular activity is unconstitutional, for that activity not to be within a public authority's scope of authority. I do not see an additional reason, besides the unconstitutionality of school prayer, in the majority's opinion giving me reason to believe that Allred's act was not within her discretionary authority. And neither can I think of one. Thus, I cannot join Part III of the majority's opinion. Its application of the "discretionary authority" requirement to Allred's act of leading her class in silent prayer is too stringent. However, I agree that Allred is nonetheless not entitled to qualified immunity for the reasons the majority states in Part IV of its opinion.

III.

A student raising his fist in the air during a curriculum portion of the school day engages in an act that inherently distracts student during class. A teacher, therefore, may prohibit a student from engaging in such activity. Thus, I cannot join Part II-C of the majority opinion's in which it holds that there is an issue of

117

material fact as to whether Holloman's First Amendment right to free speech was violated if he was punished for holding his fist in the air during the recitation of the Pledge and if that punishment was not motivated by a desire to suppress a particular viewpoint. I also dissent from the majority's holding that Holloman's right to hold his fist in the air was clearly established for qualified immunity purposes.

In addition, while I agree with the majority's conclusion that there is an issue of material fact as to whether Allred violated Holloman's clearly established right under the Establishment Clause when Allred led the class in a moment of silent prayer, I cannot join Part III of the majority's opinion. In my view, Allred acted within her discretionary function when leading her class in prayer.

Finally, I join Part V of the majority's opinion, but only to the extent that it holds that the School Board may be held liable if Holloman was punished for remaining silent during the Pledge and for Allred's act of leading her students in silent prayer. Thus, I concur in part and dissent in part with the majority's opinion.